UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LOIS FRANK INDIVIDUALLY | * | Civil Action No.: 11-871 |
| AND ON BEHALF OF WELMAN FRANK, | * | Section: |
|     Plaintiffs | * | |
| V. | * | Judge: |
| | * | |
| SHELL OIL COMPANY, SHELL | * | Magistrate: |
| CHEMICAL, LP, TRAVELERS | * | |
| INS. CO. , AND THE TRAVELERS | * | |
| INDEMNITY CO. | * | |
| Defendants | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT

Plaintiffs, Lois Frank individually and on behalf of Welman Frank, through her attorney files this Complaint as follows:

### Parties

**1.** *The Plaintiffs*

The plaintiffs are:

    A. **Lois Frank, individually and on behalf of her deceased husband Welman Frank.**

    Lois Frank is a major whose domicile is Reserve, Louisiana,  St. John the Baptist Parish.  A the time of his death, Welman Frank was a major whose domicile was Reserve, Louisiana, St. John the Baptist Parish.

**2.** *The Defendants*

The defendants are:

    **A.** **Shell Oil Company,** ("Shell Oil") is incorporated in Delaware and maintains its principal office in Texas;

    **B.** **Shell Chemical LP** d/b/a Shell Chemical Company, ("Shell Chemical") is

1

incorporated in Delaware and maintains its principal office in Texas;

C.    **Travelers Insurance Company,** a company licensed to do business in the State of Louisiana, was at all pertinent times an insurance provider for Shell Oil Company, Shell Chemical, LP(herein after collectively referred to as " Shell ") and Shell Executive Officers from 1972 through 1978, including but not limited to the deceased Executive Officers, **R. N. Lyall, Norco Complex Manager, (DECEASED), HM Miller, Norco Complex Manager Safety & Industrial Hygiene (DECEASED),** and **WM Stumpe, MD, Norco Medical Director, (DECEASED), G A White, Plant Manager(DECEASED), R J Trautner, Sr., Process Engineer(DECEASED)** and **Roy E. Joyner, MD, Corporate Medical Director** and other unknown Executive Officers are liable to the Petitioners pursuant to the Louisiana Direct Action Statute, formerly known as LA R.S. 22:655.

D.    **The Travelers Indemnity Company**, a company licensed to do business in the State of Louisiana, was at all pertinent times an insurance provider for Shell Oil Company, Shell Chemical, LP(herein after collectively referred to as " Shell ") and Shell Executive Officers from 1972 through 1978, including but not limited to the deceased Executive Officers, R. N. Lyall, Norco Complex Manager, (DECEASED), HM Miller, Norco Complex Manager Safety & Industrial Hygiene (DECEASED), and WM Stumpe, MD, Norco Medical Director, (DECEASED), G A White, Plant Manager(DECEASED), RJ Trautner, Sr., Process Engineer(DECEASED) and Roy E. Joyner, MD, Corporate Medical Director and other unknown Executive Officers are liable to the Petitioners pursuant to the Louisiana Direct Action Statute, formerly known as LA R.S.

2

22:655.

**3.**     The significant exposure of Welman Frank to benzene and/or benzene containing products as a result of the acts or omissions of the SHELL deceased Executive Officers, R. N. Lyall, Norco Complex Manager, (DECEASED), HM Miller, Norco Complex Manager Safety & Industrial Hygiene (DECEASED), and WM Stumpe, MD, Norco Medical Director, (DECEASED), G A White, Plant Manager(DECEASED), RJ Trautner, Sr, Process Engineer(DECEASED) and Roy E. Joyner, MD, Corporate Medical Director, and other unknown Executive Officers located in Norco, Louisiana was a substantial contributing cause in development of his Acute Lymphoblastic Leukemia("ALL Leukemia").

**4.**     The deceased "SHELL" Executive Officers, R. N. Lyall, Norco Complex Manager, **(DECEASED), HM Miller, Norco Complex Manager Safety & Industrial Hygiene (DECEASED), and WM Stumpe, MD, Norco Medical Director, (DECEASED), G A White, Plant Manager(DECEASED), RJ Trautner, Sr., Process Engineer(DECEASED) and Roy E. Joyner, MD, Corporate Medical Director** resided in the Parish of Jefferson, State of Louisiana prior to and at the time of their deaths and Travelers Insurance Company can be pursued directly for the acts and omissions of these deceased "SHELL" Executive Officers.

**Jurisdiction and Venue**

**5.**     This Court has jurisdiction under 28 U.S.C. § 1332. There is complete  diversity of citizenship among the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

**6.**     Venue is proper in this district pursuant to 28 U. S.C. § 1391 because a large portion of the

3

negligent and wrongful actions of the defendants occurred at the SHELL NORCO Refinery in St. Charles Parish in the Eastern District of Louisiana.

**7.**     This Court has personal jurisdiction over the defendants who are doing business in the district or who did business in this district at the relevant times.

**8.**     The Defendants are incorporated under the laws of Texas, and the principle place of business are in Texas and Connecticut.

<u>**Background**</u>

**9.**     Mr. Frank worked as a contract worker at the SHELL NORCO refinery from 1972 to 1973.  He was tasked with cleaning out storage tanks.

**10.**     Mr. Frank worked for SHELL NORCO  cleaning tanks and other duties form 1973 to 2002.

**11.**     The plaintiff was regularly and frequently exposed to unsafe levels of benzene on a daily basis which resulted in his development of ALL Leukemia.

**12.**     Shell Oil Company, Shell Chemical, LP and their Executive Officers SHELL employees [hereinafter collectively referred to as "SHELL"], knew that its employees were developing blood cancers and blood diseases at SHELL Norco and other facilities. Employees of SHELL, including but not limited to pipefitters, mechanics, operators, carpenters, lab workers, chemists, clerks, drivers,  engineers, field gaugers, firemen, foreman, general helpers, inspectors, insulators, machinists, lease operators, technicians, supervisors, testers, warehousemen, terminal receivers, production operators, production foremen, and terminal foreman for the defendants have developed blood cancers[1].

---

[1] SHELL Oil Co. Medical Surveillance Database for Multiple Myeloma, Bates # 241440-241444 attached and incorporated as Exhibit 1.

13.     The Defendants knew that SHELL employees were developing blood disorders and cancers at the Norco, Louisiana facility prior to 1960. SHELL failed to warn its' workers that SHELL employees were contracting AML, ALL, CLL, CML and other forms of leukemia; aplastic anemia; myelodysplastic syndrome; lymphoma, and over one hundred and fifty (150) cases of multiple myeloma from 1960 through 2009.[2]

14.     Mr. Frank worked at the SHELL Norco, in the "Coke Unit" as a unit operator and later as a shift foreman starting in 1974 and continuing through 2002. Mr. Frank's job duties included cleaning tanks and maintenance operations at the facility.

15.     On or around 2002, Welman Frank was diagnosed with Acute Lymphoblastic Leukemia("ALL Leukemia"), and other blood disorders. He died as a result of his Leukemia in 2002.

16.     The plaintiff was regularly and frequently exposed to unsafe levels of benzene on a daily basis which resulted in his development of ALL Leukemia, and other blood disorders.

17.     From 1972 through 2002 the plaintiff would use products containing benzene and come into contact with benzene and benzene containing products at the defendants' Norco facility on a daily basis.

18.     At all material times herein, SHELL was a manufacturer, distributor, seller, supplier, or large industrial consumers of benzene or benzene containing products.

19.     While working as an employee SHELL from 1972 through 2002, Mr. Frank was exposed daily to high levels of benzene while performing tasks at the defendant's facilities.

---

[2] SHELL Oil Co. Medical Surveillance Database for Multiple Myeloma, Bates # 241440-241444 attached and incorporated as Exhibit 1.

20.    The Mr. Frank sustained tissue damage shortly after each exposure to benzene, resulting in distinct bodily injury in each year from 1972 through 2002.

21.    The health hazards of benzene have been recognized for over 100 years. Benzene has been medically recognized as a carcinogen known to cause leukemia, and other blood diseases for decades. By the end of 1948 it was widely known in the United States, to those in defendants' industry, as well as the named Defendants that exposure to benzene could cause a myriad of ill health effects including such diseases as leukemia and other blood disorders.[3]

22.    Through internal medical studies, unknown to plaintiffs, the defendants knew of the health hazards inherent in the products they manufactured, distributed, sold, supplied, owned, transported, or used. The actions and inactions of the Defendants constitute gross negligence, intentional torts and demonstrate a reckless disregard for the rights and safety of others. Furthermore, the Defendants committed numerous tortious acts that included, without limitation, negligently misrepresenting, concealing, suppressing, and omitting material information about the health effects of benzene and appropriate precautionary measures.

23.    As a direct and proximate result of exposure to benzene and products containing high levels of benzene, Mr. Frank suffered injuries and incurred losses, including, but not limited to ALL Leukemia; blood disorders,  physical damage, severe physical and mental pain, fear of further disease processes, disability, medical expenses, and loss of enjoyment of life.

24.    The causal connection between injuries such as leukemia and benzene has been scientifically documented since the early 1900's.

---

[3] September 1948, American Petroleum Institute Toxicological Review on Benzene, attached and incorporated as Exhibit 2.

25.     The development of Acute Lymphoblastic Leukemia is a result of chronic benzene exposure. Breathing benzene can cause drowsiness, dizziness, rapid heart rate, headaches, tremors, confusion, and unconsciousness. Breathing very high levels of benzene can also result in death. Eating or drinking foods containing high levels of benzene can cause vomiting, irritation of the stomach, dizziness, sleepiness, convulsions, rapid heart rate, and death have been well documented. Death resulting from Acute Lymphoblastic Leukemia has been associated with benzene exposure.

26.     Acute Lymphoblastic Leukemia is a malignant disease that affects the blood and bone marrow.

27.     Scientists have also linked myelodysplastic syndrome (MDS), aplastic anemia, pancytopenia, cytopenias, myelofibrosis, and polycythemia vera to benzene exposure.

28.     The Latency period for the development of injuries after benzene exposure has been known to range from less than 5 years to in excess of 50 years. Practically all of the adverse chronic effects of exposure to benzene are a result of its influence or its oxidation products on the blood forming system.

29.     Exposure to benzene is usually by vapors, although skin contact and dermal absorption also occurs. Chronic benzene poisoning results from repeated or continuous exposure to relatively low concentrations of benzene vapors. Long-term benzene exposure may also adversely impact marrow and bone.

30.     In the September 1948 Edition of the American Petroleum Institute, Toxicological Review, the authors recommended precautionary measures for workers who are exposed to

benzene. Furthermore, the review stated that benzene use was extensive in the petroleum industry with the greatest amount of benzene blended into motor gasoline. (A copy of the article is attached as Exhibit 2.)

31.     As of 1948, the American Standards Association and most states had set an arbitrary limit of 100 ppm as the maximum permissible benzene concentration for workers exposed to this substance during an 8-hour day. In 1948 the American. Petroleum Institute reported that **"Inasmuch as the body develops no tolerance to benzene, and as there is a wide variation to individual susceptibility, it is generally considered that the only absolute safe concentration for benzene is zero."** The concentration of benzene vapor in the air should be checked regularly in situations where excessive exposures are apt to be encountered.

32.     The safety measures necessary for the prevention of benzene poisoning are primarily those designed to prevent the inhalation of benzene vapor. Ventilation should be designed to prevent toxic concentrations of the vapor from reaching the breathing zone of individuals who may potentially be exposed. Individuals who must be exposed to benzene vapor should be rotated to reduce their exposure time to a minimum. When excessive concentrations are unavoidably encountered in operations, such as the cleaning of tank cars, vats, storage tanks, air masks should be employed. Skin contact and possible dermatitis from benzene should be avoided entirely if possible; but, if the hands must contact the solvent, then neoprene gloves or protective creams should be used.

33.     SHELL knew about the causal relationship between benzene and cancer related illnesses. SHELL concealed this information from the public, various workers and other individuals who were exposed to their benzene products.

### Fraudulent Concealment

**34.**    SHELL has known of the causal relationship between benzene exposure and blood malignancies including ALL Leukemia since the 1940's. Shell Oil Co., Shell Chemical, LP, and it's Executive Officers withheld information regarding cases of multiple myeloma, lymphoma, and leukemia from OSHA and the EPA.  Disclosure of such information is required by law pursuant to the Toxic substances control Act, 15 U.S.C. §2614.

**35.**    SHELL has consistently denied the relationship between benzene and ALL Leukemia, multiple myeloma and lymphoma since the l940's. SHELL failed to report cases of ALL Leukemia, lymphoma and 150 cases of multiple myeloma from employees, the government and the public. SHELL has  engaged in fraudulently concealing the causal relationship from it's employees, the government regulators and the public in order to maximize profits and avoid liability.

**36.**    In 1942, SHELL prepared a memo entitled, Properties of Benzene-Norco Refinery Benzene SHELL Oil Co. reporting that benzene causes blood diseases and disorders.[4]

**37.**    In 1957, CH Hines reported that Shell Oil Co, has known for years that benzene causes damage to the blood.[5] Yet, by 1957 SHELL was not informing workers of the health hazards and dangers of benzene.

---

[4] Properties of Benzene-Norco Refinery, July 03, 1942, SHELL Oil Co. Memo,
Bates # 10025-10073, attached and incorporated as Exhibit 3.

[5] SHELL Oil Co, Memo by CH Hines, January 22,1957, _Bates # 12956, attached and incorporated as Exhibit 4.

**38.**     In 1961, SHELL Oil Co. documented the first employee case of multiple myeloma.[6]

**39.**     On March 18, 1977, Shell Oil Co. reported 8 cases of Multiple Myeloma, 18 cases of lymphoma and 2l cases of leukemia including 5 cases of CLL Leukemia in an unpublished internal study that was authored by the Shell Oil Co.'s Corporate Medical Director, Dr. Roy Joyner, entitled " Report on Mortality From Leukemia and Lymphoma," 3/18177.[7]  This report was prepared in anticipation of the 1977 OSHA Temporary Emergency Benzene Standard.

**40.**     In 1977, OSHA (Occupational Safety and Health Agency) requested cancer data from all industries with benzene in the refineries which included Shell Oil Co. Shell Chemical, LP and it's Executive Officers.

**41.**     In August 1977, Shell Oil Co. presented cancer data at the OSHA Temporary Benzene Standard Hearings in a report entitled, "Report on Mortality From Leukemia," by Dr. Roy Joyner, Shell Oil Co.'s Corporate Medical Director.[8]

**42.**     On August 01, 1977, Dr. Joyner and Dr. Stallones testified under oath that SHELL did not have any other cases of blood dyscrasia other than the leukemia cases presented to OSHA.[9]

---

[6] SHELL Oil Co. Medical Surveillance Database for Multiple Myeloma, Bates 4 241440-241444, attached and incorporated as Exhibit 1.

[7] Unpublished Report, Report on Mortality From Leukemia and Lymphoma 3/18/77, Roy Joyner, SHELL Oil Co., Corporate Medical Director, Bates # 9231-9259, attached and incorporated as Exhibit. 5.

[8] "Report on Mortality From Leukemia," SHELL Oil Co., Dr. Roy Joyner, Corporate Medical Director SHELL Oil Co., 1977, attached and incorporated as Exhibit 6.

[9] Deposition of Dr. Roy Joyner, Corporate Medical Director, SHELL Oil Co., June 22,2009, at pg. 35-37, attached and incorporated as Exhibit 7

43.    SHELL failed disclose the 8 cases of multiple myeloma, and the 18 cases of lymphoma to OSHA at the Temporary Benzene Standard Hearings.[10]

44.    On October 13, 1978, SHELL Norco reported 59 out of 130 SHELL employees had one or more blood abnormalities.[11] Yet, SHELL continued to conceal the health effects and the significance of the blood abnormalities from workers that were exposed to benzene on a daily basis.

45.    On November 15, 1978, SHELL Oil Co. reported 20 of 89 Norco employees had one or more blood abnormalities.[12] Even after this, SHELL continued to conceal the health effects and the significance of the blood abnormalities from its workers that were exposed to benzene on a daily basis.

46.    In 1981, SHELL Oil Co. circulated a memo stating that statistically significant increases in multiple myeloma and Lymphoblastic leukemia were found in a study, and an internal training manual that says benzene causes multiple myeloma and leukemia SHELL failed to inform it worker's including Mr. Frank of the findings.[13]

47.    In 1982, Dr. Peter Infante, an Epidemiologist from OSHA requested documentation of

---

[10] Deposition of Roy Joyner, Corporate Medical Director of SHELL Oil Co., pg.35-37 ,attached and incorporated as Exhibit 7.

[11] SHELL Oil Co. Memo, Norco Benzene Medical Surveillance Program 10113/78, Bates # 10765-10777, attached and incorporated as Exhibit 8.

[12] SHELL Oil Co. Memo, Norco Benzene Medical Surveillance Program 11/15/78, Bates # 10778-10790, attached and incorporated as Exhibit 9.

[13] Memorial Sloan-Kettering Cancer Center Morbidity and Mortality Study Interim Report, 1981, Bates 5379-5399, attached and incorporated as Exhibit 10.

the cases of multiple myeloma , lymphoma, and leukemia at SHELL.[14]

48.     On April l 7,1984, Dr. Peter Infante wrote a letter to Shell Medical Director, Dr. Roy Joyner, stating that SHELL may be withholding information from OSHA and that SHELL employee communications do not reflect the studies findings.[15]

49.     On May 02, 1985, C.E. Ross of Shell Oil Co. prepared a review of the elevation of Standardized mortality Ratios [SMR] at SHELL Refineries from 1973-1983.  This report found an increase in cases of blood cancers including multiple myeloma, Leukemia( including AML, CML, and  ALL), and lymphoma.[16] At this time, SHELL continued to concealed the findings from Mr. Frank and its employees/

50.     SHELL investigators discovered a statistically significant increase in cases of leukemia, and opined it was related to benzene exposure.  Later, SHELL changed it's findings at the instructions of its management and executive officers.[17]

51.     In 1988, SHELL Oil Co. reported in the ***Shell Wood River Expanded Medical Surveillance Program-Two Year Summary 9/16/88,*** that employees with abnormal blood results including

---

[14] OSHA letter from Dr. Peter Infante to SHELL Oil Co., dated 12/22/82, Bates #6866-6867, attached and incorporated as Exhibit 11.

[15] OSHA letter, dated 4/17/84, from Peter Infante, PhD to Roy Joyner, MD, SHELL Oil Corporate Medical Director, Bates # 12432-12435, attached as Exhibit 12.

[16]Review of SMR Elevations at SHELL Refineries 1973-1983, 5/2/85, C.E. Ross, Bates # 12603-12607, attached and incorporated as Exhibit 13.

[17] Chronology of Leukemia Studies in SHELL Locations, Bates #11877-11894, attached as Exhibit 14.

multiple myeloma and CLL Leukemia and lymphoma had been exposed to benzene.[18] In spite of all this information, SHELL continued to deny the causal relationship between benzene and these blood cancers.

52.    On May 12, 1989, SHELL Oil Co. reported 2 cases of multiple myeloma, 3 cases of myelodysplastic syndrome, 1  case of CLL Leukemia, 1 case of CML Leukemia, and 4 cases of lymphoma during the Meeting at Wood River on Wood River EMS Program on 10 April 1989. These illnesses occurred in benzene exposed employees that were being monitored for blood disorders.[19]

53.    On February 14, 1989, SHELL Oil Co. reported abnormal blood results including multiple myeloma and leukemia in the *Wood River EMS-Summary for First Three Full Years 2/14/89.*[20]

54.    SHELL documents released in 2009 show that SHELL employees with 20-29 years of service include 45 cases of multiple myeloma; and employees with 30-39 years of service include 67 cases of multiple myeloma.[21]

55.    SHELL documents released in 2009 list the  deaths of SHELL Oil employees from multiple myeloma in 2009 as follows: 37 deaths of SHELL employees in the 1980's; 45 deaths of SHELL

[18] SHELL Oil Co. Memo, 1988, Wood River Expanded Medical Surveillance Program-Two Year Summary 9/16/88, Bates # 13019-13023, attached and incorporated as Exhibit 15.

[19] SHELL Oil Co., CE Ross. Meeting at Wood River on Wood River EMS Program 10 April 1989 ,5/12/89, Bates # 9228-9330, attached and incorporated as Exhibit 16.

[20] SHELL Oil Co. , SR Cowley, Wood River EMS-Summary for First Three Full Years 2/14/89 13442-13453, attached and incorporated as Exhibit 17.

[21] SHELL Oil Co. Medical Surveillance Database for Multiple Myeloma, Bates # 241440-241444, attached and incorporated as Exhibit 1.

employees in the 1990's and 49 deaths of SHELL employees from 2000 through 2009.[22] These documents show one hundred and fifty(150) deaths of SHELL employees from multiple myeloma from 1961 through 2009 which included statistically significant excesses for many of the years.[23]

56.     SHELL date produced in 2009 documents employee deaths from multiple myeloma as follows: 24 cases at Deer Park, 5 cases at Martinez, 6 cases at Norco, 11 cases at Wood River, and 104 cases at other SHELL facilities[24]

57.     None of the abnormal blood findings or blood cancers including multiple myeloma, CLL Leukemia, myelodysplastic syndrome, CML Leukemia and other leukemia's were reported to Mr. Frank, and other workers at Norco.

58.     The results of abnormal blood counts of pipefitters and other employees at SHELL Norco were concealed from Mr. Frank and others who were continuously exposed to unsafe levels of benzene on a daily basis. SHELL knew that its employees exposed to benzene for long periods of time were developing different forms of blood cancers including Leukemia. Many of these blood cancers occurred while SHELL employees were in the mandatory benzene blood monitoring program ordered by OSHA for workers that were exposed benzene.

59.     On July 02, 1969, SHELL notified its administrators that chronic benzene poisoning

---

[22] SHELL Oil Co. Medical Surveillance Database for Multiple Myeloma, Bates # 241440-241444, attached and incorporated as Exhibit 1.

[23] SHELL Oil Co. Medical Surveillance Database for Multiple Myeloma, Bates # 241440-241444 attached and incorporated as Exhibit 1.

[24] SHELL Oil Co. Medical Surveillance Database for Multiple Myeloma, Bates # 241440-241444, attached and incorporated as Exhibit 1.

occurs frequently in industry from inhalation of vapor.[25]

60.     On. July 25, 1973, SHELL informed its refinery managers that the risk of leukemia from benzene exposure is grossly exaggerated.[26]

61.     As of  March 13, 1975, SHELL did not have a full time industrial hygienist stationed at the Norco facility.[27]

62.     On February 10, 1984 SHELL denied that the results of employee studies established a causal relationship between benzene and leukemia.[28] Late in the same report, SHELL  stated that it found 6 more death from leukemia than would by found in the typical U.S. populations during the same time period.  (expected leukemia mortality for the time period was two (2)).

63.     Dr. Shan Tsai, Manager of Epidemiology for SHELL Oil Co. testified that he began working in the Epidemiology Department at SHELL Oil in 1988.[29] Dr. Tsai testified that SHELL Oil has not conducted a single study of SHELL employees that died of multiple myeloma.[30] SHELL failed to conduct a study of employees that developed ALL Leukemia.

64.     Dr. Tsai testified that SHELL has never attempted to calculate the incidence rate for the 150 deaths of multiple myeloma.[31]

---

[25] SHELL Oil Co. Letter, dated July 02, 1969, from PV Peurifoy, attached as Exhibit 21.
[26] SHELL Oil Co. Letter, dated July 25, 1973, attached as Exhibit 22.

[27] SHELL Oil Co. Letter, dated March 13, 1975, attached as Exhibit 23.
[28] SHELL Employee Communication, dated February 10, 1984, attached as Exhibit 24.

[29] Deposition of Shan Tsai, June 25, 2009, pg. 5, 14, attached as Exhibit 18.

[30] Deposition of Shan Tsai, June 25, 2009, pg. 24-26, attached as Exhibit 18.

[31] Deposition of Shan Tsai, June 25, 2009, pg. 31-32, attached as Exhibit 18.

65.     Dr. Tsai testified that the SHELL Oil Epidemiology Department does not report cases of multiple myeloma to the USEPA under the Toxic Substance Control Act.[32]

66.     In 1987, OSHA made an official statement that epidemiological evidence demonstrates that benzene exposure can cause multiple myeloma and leukemia.[33]

67.     OSHA requires companies to identify all diseases involving a chemical where at least one competent epidemiological study has been conducted. To date, SHELL Oil has not listed benzene as a cause of ALL, CLL Leukemia, multiple myeloma or other blood disorders caused by benzene on any of it's benzene containing products or the material safety data sheets.

68.     To date, SHELL continues to deny the causal relationship between benzene exposure and Leukemia(including ALL, AML and CLL), multiple myeloma, lymphoma and other blood cancers and refuses to warn employees coming in contact with SHELL products that contain benzene.

69.     In a final example of the pattern of fraudulent concealment that has been ongoing for decades, SHELL litigation strategy documents calls for concealing sensitive documents and leaves the reader with a poem to further instruct counsel to confuse the trier of fact on the relationship between blood cancers and diseases as follows:

---

[32] Deposition of Shan Tsai, June 25, 2009, pg. 38, attached as Exhibit 18.

[33] Federal Register, OSHA, 29 CFR Part 1910, September 11, 1987, Occupational Exposure to Benzene, Final Rule, attached as Exhibit 19.

### SMOKE SCREEN[34]

**"One fine morning in the middle of the**

**night Two dead boys got up to fight.**

**Back-to-back they faced each other,**

**Drew their swords and shot each other,**

**A deaf policeman heard the noise**

**And came and shot the two dead boys.**

**If you don't believe my tale is true,**

**Ask the blind man, he saw it too."**

**70.**     The defendants are guilty of negligence, gross-negligence, intentional concealment, intentional torts, strict liability, and fault identified throughout this complaint more specifically as follows:

### Negligence

**71.**     The SHELL breached duties owed to the plaintiffs to exercise proper care in manufacturing and selling their products. The breached duties include, without limitation, the duty:

    **a.** to select materials other than benzene for inclusion into its products;

    **b.** to sell benzene-free products;

    **c.** to fully test and investigate their respective products for health risks associated with the normal and intended use of its products;

---

[34] Benzene Litigation, Duties, Defenses and Strategies by Richard O. Faulk, Senior Litigation Attorney, SHELL Oil Co., attached as Exhibit 26

    **d.**  to fully warn users of its products on the health effects and dangers associated with exposure to benzene  products

    **e.**  to fully instruct and warn users and bystanders, including plaintiff,  in the use of its products in a manner that would  eliminate or reduce the health hazards associated with their normal and intended use;

    **f.**  to fully warn foreseeable users and bystanders such as the plaintiffs as additional medical knowledge became available concerning the health hazards associated with their products;

    **g.**  to recall its products upon discovering the health hazards associated with those products;

    **h.**  to inspect fully and adequately the design, selection, testing, instruction and warnings that should have accompanied the sale of such products;

    **i.**  to refrain from misrepresenting the safety and health risks of the products they sold;

**72.**    As a direct and proximate result of the Defendants' negligent breach of their duties to Mr. Frank, the plaintiffs have sustained injuries, damages and losses. The scope of the duties breached by the Defendants encompasses the risk of the injuries sustained by the plaintiffs. The duties breached were intended to protect the plaintiffs from the injuries they have sustained. The Defendants breach of their duties constituted the direct legal cause of the injuries to the plaintiffs. The Defendants are thus jointly and solidarily liable for all damages caused by their breaches.

## Strict Product Liability

**73.**    Exposure to benzene from the Defendants' products and/or products under their care, custody and control resulted from the normal, foreseeable, and intended use of the products, without substantial change in the condition in which the defendants sold or supplied these products.

**74.**    The defendants' products were defective, presented an unreasonable risk of harm, and were unreasonably dangerous under normal use at the time the products left the Defendants' control.

**75.**     The plaintiff was an intended and foreseeable user of the alleged defective products and

damages and loses to the plaintiffs could reasonably have been anticipated by the defendants.

**76.**     The defects in the SHELL's  products and equipment include, but are not limited to, the

following:

> **a.** The products are unreasonably dangerous per se because the cost of injuries as
> a result of the benzene content of the products, outweighed the benefits of use
> of benzene in the product
>
> **b.** inherent (and known to the defendants) characteristics that gave the products a
> potential for causing severe health problems rendering the products
> unreasonably dangerous per se;
>
> **c.** lack of sufficient warnings of the inherently dangerous nature of the products
> when used in the fashion in which they were anticipated or should have been
> anticipated being used;
>
> **d.** lack of warnings or lack of sufficient instructions for eliminating the health
> risks inherent in the foreseeable use of the products;
>
> **e.** lack of sufficient inspections by the defendants of their products to ensure that
> such products contained sufficient warnings of the dangerous properties of
> the products;
>
> **f.** lack of reasonable inspections by the defendants of their products to ensure that
> such products contained sufficient instructions for eliminating or minimizing
> the health risks inherent in the use of the products ;
>
> **g.** lack of tests or lack of sufficient tests to determine the effect of benzene
> vapors on intended users and bystanders;
>
> **h.** defective designs calling for the inclusion of benzene in products that did not
> require benzene, when alternative, equally suitable substances were available,
> and
>
> **i.** failure to research, study and be aware of medical and scientific studies
> concerning the health hazards of benzene; and
>
> **j.** other acts which may be revealed at the trial of this matter.

19

77.    The defendants manufactured their products with conscious disregard for the safety of users of the products and other persons who might be injured thereby.

78.    As a result of the defective and unreasonably dangerous condition and composition of the benzene containing products manufactured, distributed and/or sold by all SHELL, Mr. Frank inhaled benzene fumes and other harmful substances emitted by the normal use of the products.  This exposure is the proximate cause of Mr. Franks' Leukemia. SHELL is strictly liable for the damages caused by its unreasonably dangerous product.

79.    The defendants are hence jointly and solidarily strictly liable for the damages caused by their fault.

**Former Article 2317 liability.**

80.    Mr. Frank's  Leukemia was caused by an unreasonably defective thing that was within the defendants' care, custody or control, namely, benzene and benzene containing products. Since Mr. Frank suffered his benzene exposures while former Article 2317 of Louisiana Civil Code was still in effect, it governs here. It provided:

> "We are responsible, not only for the damages occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody . . ."

81.    In interpreting this Article, the Louisiana Supreme Court in *Loescher v. Parr* 324 So.2d 441, 447-48 (La. 1976) determined that when harm results from a defect in a thing that creates  an unreasonable risk of harm to others, the person legally responsible for the custody of that thing may be held liable for the resulting damages, even though no personal negligent act or inattention on the

person's part is proved. This liability arises from the person's legal relationship to the thing that presents an unreasonable risk of harm to others. Under former Article 2317, a plaintiff must prove the thing in question was defective, which means that it posed an unreasonable risk of harm; it was in the garde, i.e., care, custody or control of the defendant, and the plaintiff was damaged as a result of the defect.

82.     As demonstrated above, when Mr. Frank was exposed to SHELL's unreasonably dangerous benzene or benzene containing products at the its facilities,  SHELL had control because they owned or controlled the facilities where Mr. Frank was exposed to benzene.

### Concealment, Misrepresentation, Fraud

83.     The Defendants were aware of the dangerous condition presented by exposure to benzene, and that Mr. Frank would suffer from benzene-related diseases and other ill health effects associated therewith as a result of this exposure.  Defendants failed and/or willfully withheld knowledge of the health dangers from exposure to benzene. Under Louisiana law fraud may be either active or passive. Passive fraud may arise from a defendant's silence or failure to act. To state a claim for passive fraud, Louisiana courts generally require a showing of the following elements: (1) the information that was withheld, (2) the general time period during which the fraudulent conduct occurred, (3) the relationship giving rise to the duty to speak, and (4) what the person or entity engaged in the fraudulent conduct gained by withholding the information. *See Chrysler Credit Corp. v. Whitney Nat'l Bank,* 824 F.Supp. 587, 598 (ED. La. 1993). In support of their fraud claims against each of the defendants, the plaintiffs would respectfully show as follows:

84.

## Shell Oil Co. And Shell Chemical ,LP

**85.**    Mr. Frank worked at SHELL Oil Co., and SHELL Chemical, LP. During their work for SHELL it engaged in passive fraud by withholding important safety information from Mr. Frank. Specifically, SHELL failed to inform Mr. Frank of the health risks associated with benzene exposure. SHELL failed to inform. Mr. Frank that the work he was assigned to perform at the SHELL Norco facility caused him to be exposed to toxic levels of benzene. SHELL failed to inform Mr. Frank of the need to wear safety equipment and respiratory protection while performing his work. Finally, SHELL failed to inform Mr. Frank that the piping, equipment, process lines, valves, and chemicals that he was working with or around contained benzene or that fugitive emissions of benzene were present at the facility.

**86.**    The fraudulent activity giving rise to Mr. Frank's cause of action against SHELL occurred during the following time periods: 1972 through 2002.

**87.**    Mr. Frank performed work on the premises of SHELL at the request and for the benefit of SHELL. As the premises owner SHELL has a duty to warn employees of hazards on its premises. SHELL also has the duty to take reasonable actions to prevent injury to employees performing work on its premises.

**88.**    The fraud, concealment, and misrepresentations committed by SHELL benefited the SHELL by getting employees like Mr. Frank to perform dangerous work for the defendant which Mr. Frank would have refused to perform had he know of the dangers of the work. Additionally, SHELL did not have to go to the expense or endure the delay associated with the safety precautions that should have been utilized to perform Mr. Frank's work.

89.     Defendants were aware of the unreasonably dangerous nature of benzene and products containing benzene (see Exhibit 2) long before 1948 but, nevertheless, never warned Mr.Frank about the health hazards associated with benzene. In fact, the defendants deliberately concealed this information from Mr. Frank. As a result of suppressions of this information, SHELL sought to prevent or limit claims by persons injured.

90.     Defendants' misrepresentations and suppressions arose in the following manner:

> a.  The material published or caused to be published was false and incomplete and that the Defendants knowingly and deliberately deleted references to the known health hazards of benzene and benzene containing products.

> b.  The Defendants intended the publication of false and misleading reports and/or the non- disclosure of documented reports of the health hazards of benzene.

91.     The acts of the Defendants, as described above, constituted misrepresentations and/or concealment, which proximately caused the injuries and damages to Mr. Frank.

**Unjust Enrichment**

92.     The misrepresentations and suppression of the truth regarding the health hazards of benzene and benzene containing products were made by the SHELL defendants with the intent of obtaining an unjust advantage over Mr. Frank who remained uninformed and ignorant of the risks of contracting benzene related diseases. These representations and suppressions were calculated to produce the effect of misleading the public and persons such as Mr. Frank so that they would not associate any disease with benzene or benzene containing products.

93.     The misrepresentations and suppressions of the truth of benzene hazards made by the SHELL defendants were in an effort to:

    **a.** Maintain a favorable atmosphere for the continued sale and distribution and use of benzene and benzene-containing products;

    **b.** Assist in the continued pecuniary gain of the Defendants through the sale of benzene products to an ignorant public;

    **c.** Mislead the general public, and the plaintiff herein, about the hazards associated with benzene products in order to prevent relevant medical inquiry about benzene products in order to prevent relevant medical inquiry about benzene disease and thus provide a defense against claims;

    **d.** Influence, in the Defendants' favor, legislation to regulate benzene exposures and unlimited medical and disability claims for compensation;

    **e.** Induce the plaintiffs and the public in general to use and continue to use benzene products.

### Damages Sustained by Mr. Frank's Wife

**94.** By reasons of the Defendants' fault, as described above, and because of the injuries and ill health effects suffered by Mr. Frank, as a result of his benzene related disease; Mr. Frank's wife has suffered loss of consortium, loss of services, loss of affection, and loss of nurture and are entitled to damages as are reasonable.

### Compensatory Damages

**95.** As a result of the acts and omissions of the defendants, the plaintiffs are entitled to recover money damages, both past and future, for all elements of damages allowed by Louisiana law. These damages are, without limitation:

    **a.** Past, present, and future physical pain and suffering;
    **b.** Past, present, and future mental anguish and emotional distress;
    **c.** Disfigurement and embarrassment;
    **d.** Physical Impairment;
    **e.** Past and future earnings;
    **f.** Lost earning capacity;
    **g.** Physical Impairment;
    **h.** Physical and Mental Disabilities;
    **i.** Past, present, and future medical care, convalescence, mental and physical therapy and all other health care expenses;
    **j.** Loss of enjoyment of life;
    **k.** Expenses to train, educate or otherwise enable the plaintiffs to be gainfully

employed; and

**l.** Loss of society, consortium, companionship, services, nurture, and love and affection;

**m.** Wrongful death damages;

**n.** Survival damages;

**o.** Cancer;

**p.** Fear of Cancer and other diseases;

**q.** Increased Risk of Cancer; and

**r.** Loss of society, consortium, companionship, services, nurture, and love and affection.

## Discovery Rule

**96.**    The prescriptive period does not start until the plaintiffs knew or should have known that the plaintiff's ALL Leukemia was caused by benzene. Here, the result of the plaintiffs exposure to benzene was inherently undiscoverable. The cancer took years to develop, and even when the symptoms did manifest, neither the physicians nor the plaintiffs detected the link between his benzene exposures and his malignancies. The Welman Frank never heard or saw anything that linked benzene to his malignancy. Mrs. Frank, Welman Franks widow,  did not learn of a possible connection between the benzene Mr. Frank was exposed and his illness until February of 2011. Mr. Frank's cancer was the product of exposure to these chemicals over a period of time rather than form a single point in time. Hence, the limitation period didn't start until earlier this year when the plaintiff learned about the cause of his Leukemia.

## Intentional Tort

**97.**    Plaintiffs incorporate herein each allegation set forth above. SHELL was well aware of the serious health hazards associated with use of benzene. Consequently, if companies such as SHELL had concern for the health and well-being of workers using and/or being exposed to benzene and benzene-containing products, they should have provided information and warnings on the need to limit exposures, educated workers, measured airborne exposure levels, provided adequate and safely designed protective equipment, and conducted medical examinations.

98.     The actions and inactions of the SHELL and its executive officers, whether taken separately, or together, were of such a character as to constitute a pattern or practice of intentional wrongful conduct and/or malice resulting in damage and injury to the Plaintiffs. More specifically, SHELL and its executive officers, consciously and/or deliberately engaged in oppression, fraud, wantonness and/or malice with regard to Welman Frank and other employees. Therefore, SHELL should be held liable for the intentional infliction of physical injury upon its employee, Mr. Welman Frank.

### Shell Benzene Industrial Hygiene

99.     Frank Parker, III, former manager of Shell Oil Co.'s Industrial Hygiene Program testified that: 1) SHELL did not have a industrial hygienist stationed in Norco until the late 1970's; 2) SHELL resisted the 1977 benzene standard; 3) SHELL Norco had inadequate resources to protect workers at Norco from Benzene exposure; 4) SHELL failed to evaluate the risks at Norco to protect the workers from benzene exposure; 5) SHELL did provide personal protective equipment to protect workers from benzene exposure; 6) economic and management decisions resulted in exposure of workers to benzene at Norco; 7) SHELL made a decision not to warn workers of benzene exposure dangers in the 1970's; 8) pipefitters at SHELL Norco were exposed to benzene vapors on a regular and frequent basis; 9) SHELL knew that pipfitters were regularly exposed to unsafe levels of benzene exposure at Norco; 10) SHELL failed to warn pipefitters of the dangers of benzene; and 11) SHELL knew of the health hazards associated with benzene exposure including aplastic anemia and leukemia prior to the 1970's.[35]

100.    Mr. Frank's ALL Leukemia was a natural, direct and/or probable consequence of his

---

[35] Affidavit of Frank Parker, Ill dated May 04, 2009, attached as Exhibit 20.

exposure to benzene and benzene-containing products. SHELL intentionally exposed Mr. Frank to benzene and benzene-containing products by the conditions of work it imposed upon him. SHELL actually knew that he conditions of work would cause exposure to benzene and benzene-containing products, and that such exposure would cause injury.  Exposure to benzene and benzene- containing products is a harmful or offensive bodily contact. SHELL' knowingly and intentionally exposed  Mr. Frank to benzene and benzene-containing products that caused injury.  Mr. Frank's exposure led directly to the development of ALL Leukemia. Therefore, Employer Defendant intentionally exposed Welman Frank to benzene and benzene-containing products with the knowledge that such exposure was substantially certain to cause serious injury to Mr. Frank including damage to his blood.

101.    SHELL knew within a substantial certainty that the conditions of work which it imposed upon Mr. Frank and over which it had total control, would result in offensive touching, offensive contact and exposure to benzene and benzene-containing products. For many years, the SHELL actually knew that exposure to benzene and benzene- containing products could naturally, directly and probably result in the disease of ALL Leukemia in a person who received exposure or offensive touching and contact. However, SHELL intentionally chose to continue its course of conduct and allowed workers such as Mr. Frank to be exposed to benzene and benzene-containing products.

102.    The above conduct, as well as other conduct on the part of the SHELL, constitutes outrageous conduct and conduct which the SHELL knew to a substantial certainty would cause exposure to benzene and benzene-containing products from which all manner of damages would flow, including, but not limited to:

    **a.**  Benzene and benzene-containing products-related disease;

    **b.**  Leukemia, blood disorders, other related conditions, resulting pain, suffering and mental anguish;

    **c.** Emotional distress.

**103.** The extent of danger from contact with benzene and benzene-containing products was affirmatively withheld and/or concealed from Mr. Frank. As such, his contact and exposure to benzene and benzene-containing products was without his consent or his informed consent.

**104.** SHELL was fully aware of the presence of benzene and benzene-containing products in the ambient air, knowing that this toxin would be inhaled by persons such as Mr. Frank.

**105.** SHELL failed to adequately train Mr. Frank of the health hazards associated with benzene and benzene-containing products. SHELL failed to provide adequate personal protective equipment to its employees. SHELL also failed to develop and implement work practice procedures to ensure that Mr. Frank were not exposed to benzene and benzene-containing products while he performed his various job duties.

## Exemplary Damages

**106.** Under Louisiana law, Defendants are absolutely liable for damage or injuries resulting from their ultra-hazardous activity in the handling of benzene and benzene-containing products.

**107.** Defendants know or should have know that benzene was a hazardous and toxic material, and that is employee Mr. Frank was being exposed to these hazards.

**108.** As Plaintiffs' injuries and damages were caused by the SHELL wanton and reckless disregard for public safety in the storage, handling, and transportation of a hazardous substance, namely benzene and products containing benzene. Mr. Frank was exposed to these product which resulted in Plaintiffs' injuries. Defendants are liable to Plaintiffs for punitive damages under Louisiana Civil Code Article 2315.3 for Mr. Frank's exposures while that Article and its was

in effect from September 03, 1984 through April 16**,** 1996.

**Jury Trial**

**109.**    Plaintiffs pray for a trial by jury.

**Prayer**

**110.**    For the reasons recited above, the plaintiffs ask that SHELL Oil Company, SHELL

Chemical LP d/b/a SHELL Chemical Company, and Travelers Insurance Company be cited to

appear and answer, and that on final trial, the plaintiffs have:

    **a.**    Judgment against SHELL Oil Company, SHELL Chemical LP d/b/a SHELL

        Chemical Company, and Travelers Insurance Company, and Travelers Indemnity Co.

        for the actual, and special damages suffered by the plaintiffs as a result of

        Defendant's conduct;

    **b.**    Costs of suit;

    **c.**    Prejudgment and post-judgment interest at the highest rate provided by law;

    **d.**    All other and further relief to which the plaintiffs may be entitled.

                        Respectfully Submitted:

                        */s/ L. Eric Williams. Jr.*
                        L. Eric Williams, Jr. (La. Bar No. 26773)
                        **Williams Law Office, LLC**
                        3000 W. Esplanade Ave., Ste. 200
                        Metairie, Louisiana 70002
                        Telephone: (504) 832-9898
                        Facsimile: (504) 834-1511
                        E-mail:   eric@ amlbenzene.net

                        And

                        s/ Amber E. Cisney
                        Richard J. Fernandez (La. Bar No. 5532)
                        Amber E. Cisney (LA. Bar. No. 28821)
                        **Law Offices of Richard J. Fernandez,**
                        **LLC**
                        3000 West Esplanade Avenue, Suite 200
                        Metairie, Louisiana 70002

Telephone:       (504) 834-8500
Facsimile:        (504) 834-1511
E-mail: rick@rjfernandez.com
acisney@rjfernandezlaw.com
**ATTORNEYS FOR PLAINTIFFS**