# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LOIS FRANK | * | CIVIL ACTION |
| | * | |
| | * | NO. 11-871 |
| | * | |
| SHELL OIL COMPANY | * | SECTION "L"(3) |

## ORDER & REASONS

Before the Court are three motions: (1) defendants Shell Oil Company and Shell Chemical Company's (collectively "Shell") Motion to Dismiss Pursuant to Rule 12(b)(6) (R. Doc. 18); (2) Shell's Motion to Strike Pursuant to Rule 12(f) (R. Doc. 19); and (3) defendants Travelers Insurance Company and The Travelers Indemnity Company's (collectively "Travelers") Motion to Apply the Court's Ruling on the Motion to Dismiss and Motion to Strike to Travelers (R. Doc. 22).   For the following reasons, Shell's Motion to Dismiss is GRANTED IN PART and DENIED IN PART; Shell's Motion to Strike is GRANTED IN PART and DENIED IN PART; and Travelers' Motion is GRANTED.

## I.        BACKGROUND

This case arises from the illness and death of a spouse allegedly resulting from exposure to benzene in his workplace.  The decedent spouse, Welman Frank, worked at the Shell Norco refinery from 1972 to 1973 as a contract worker and from 1973 to 2002 in the "Coke Unit" as a unit operator and later as a shift foreman.  Defendant Shell was the alleged owner and operator of the Norco refinery.  Defendant Travelers was the alleged insurer of Shell and Shell's executive officers from 1972 to 1978.

During his employment at the Norco refinery, it is alleged that Mr. Frank was

1

exposed to unsafe levels of benzene on a daily basis related to Shell's role as a manufacturer and seller of benzene or benzene-containing products.  It is further alleged that this exposure to benzene resulted in Mr. Frank's development of Acute Lymphoblastic Leukemia ("ALL Leukemia").  Mr. Frank was diagnosed with ALL Leukemia in 2002, and died that same year.

On April 15, 2011, the surviving spouse of Mr. Frank, Plaintiff Lois Frank, filed suit in this Court, individually and on behalf of her husband against defendants Shell and Travelers. (R. Doc. 1).  Plaintiff alleges her husband's significant exposure to benzene and/or benzene-containing products was the result of the acts or omissions of Shell and Shell's deceased executive officers, and such acts or omissions were a substantial, contributing cause in the development of Mr. Frank's ALL Leukemia.  Plaintiff further alleges Shell knew its employees were developing blood disorders and cancers at the Norco facility and conducted internal medical studies to verify these and other health hazards related to their benzene products. Plaintiff brings the following claims against the defendants: fraudulent concealment, negligence, strict products liability, former Article 2317 liability, concealment, misrepresentation, fraud, unjust enrichment, loss of consortium, loss of services, loss of affection, loss of nurture, and intentional tort.  Plaintiff seeks both compensatory and exemplary damages.  She also has requested trial by jury.

## II.        SHELL'S MOTION TO DISMISS

### A.        Summary of Memoranda

#### 1.        *Shell's Motion*

Shell filed a Motion to Dismiss Pursuant to Rule 12(b)(6).  (R. Doc. 18).  Shell raises two bases for its Motion: (1) Plaintiff's claims are prescribed on the face of the Complaint, and (2)

Plaintiff's claims are barred by the exclusive remedy provision of the Louisiana Workers' Compensation Act ("LWCA").

Turning first the prescription argument, Shell alleges that Plaintiff's claims are prescribed on the face of the Complaint because the claims prescribed one-year from the death of the decedent in 2002, yet Plaintiff did not file suit until 2011. Because these claims are prescribed facially, Shell contends Plaintiff bears a heavy burden of establishing this prescription has been suspended or interrupted and fails to carry this burden because there was constructive knowledge of the claims well before the year preceding the Complaint. Next, Shell alleges the one-year limitations period for Plaintiff's survival action is peremptive and cannot be interrupted or suspended.

With regard to Shell's LWCA argument, it alleges that Plaintiff's claims are barred by the exclusive remedy provision because the intentional act exception is inapplicable.

### 2.    *Plaintiff's Response*

Plaintiff filed a Response in opposition to Shell's Motion. (R. Doc. 21). Plaintiff claims that prescription statutes are to be strictly construed against prescription, with the burden on Shell as the party raising the prescription issue. Plaintiff further claims that prescription was prevented from running under the doctrine of contra non valentem because Shell concealed the danger of working with benzene and Plaintiff did not reasonably know her husband's cancer and death were caused by his benzene exposure until February 2011. With regard to peremption, Plaintiff claims because she raises fraud and misrepresentation claims against Shell, it is inapplicable.

With regard to Shell's claims involving the LWCA, Plaintiff notes Mr. Frank was

contract worker, and not an employee, of Shell from 1972-73, and thus, the LWCA does not apply to that time period.  Further, Plaintiff claims that because Mr. Frank was an employee of Shell prior to the revision of LWCA which grants immunity to executive officers, Shell is liable in tort for the actions and omissions of its executive officers.  Finally, Plaintiff argues that the LWCA does not apply to her claims because they fall within the intentional tort exception to the Act.

> ### 3.  *Shell's Reply*

Shell filed a Reply in further support of its Motion.  (R. Doc. 33).  Shell reiterates its prior argument that Plaintiff's claims are time-barred because Mr. Frank was diagnosed with cancer and died in 2002, more than eight years before the present suit was filed.  Shell claims that the Complaint acknowledges the dangers of benzene exposure were publicly known and available since 1977.  Shell also contends that Plaintiff fails to make any specific fraud claims which could toll the running of prescription.

With regard to the application of the LWCA, Shell argues that the intentional tort exception does not apply because the intentional tort allegations in Plaintiff's complaint are merely conclusory, and there exists no case law holding that exposure to benzene constitutes an intentional tort.

### B.     Law & Analysis

> ### 1.     *Standard of Review*

When a court considers a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "all well-pleaded facts are viewed in the light most favorable to the plaintiff, but plaintiffs must allege facts that support the elements of the cause of action in order

to make out a valid claim." *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152-53 (5th Cir. 2010). "To avoid dismissal, a plaintiff must plead sufficient facts to 'state a claim to relief that is plausible on its face.'" *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). The court "do[es] not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).

2.    *Prescription*

As a threshold matter, the Court recognizes that "Louisiana law controls...a federal court sitting in diversity will apply state prescription periods as substantive law." *Richard v. Essex Ins. Co.*, 2009 WL 2762711, at *2 (E.D. La. Aug. 26, 2009)(citing *Guar. Trust Co. v. York*, 326 U.S. 99, 110-12 (1945)).

As noted above, the Complaint alleges the following claims on behalf of Plaintiff and her deceased husband: fraudulent concealment, negligence, strict products liability, former Article 2317 liability, concealment, misrepresentation, fraud, unjust enrichment, loss of consortium, loss of services, loss of affection, loss of nurture, and intentional tort.  (R. Doc. 1).  Certain of these claims are governed by Louisiana Civil Code article 2315.1(A)(1), Survival Action, because they are brought by the Plaintiff as the surviving spouse on behalf of decedent Mr. Frank.  Survival actions contain a prescriptive period of one-year from the death of the spouse.  *Id*.  The rest of Plaintiff's claims, those pertaining to Plaintiff personally as a result of her husband's illness and death, constitute wrongful death claims under Louisiana Civil Code article 2315.2 and are also

5

subject to prescription of one-year from the death of the spouse.

"[P]rescription statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished; thus, of two possible constructions, that which favors maintaining, as opposed to barring, an action should be adopted." *Carter v. Haygood*, 2004-0646, p. 10 (La. 1/19/05); 892 So. 2d 1261, 1268. "'[T]he burden of proof generally rests on the party asserting prescription.'" *Snowizard, Inc. v. Robinson*, 2011 WL 2681197, at *9 (E.D. La. July 8, 2011). However, "[w]hen a complaint reveals on its face that the prescriptive period has lapsed, the plaintiff bears the burden of establishing a suspension or interruption of the prescriptive period." *Bartucci v. Jackson*, 245 Fed. App'x 254, 257 (5th Cir. 2007). Based upon the facts alleged in the Complaint, Mr. Frank was diagnosed with ALL Leukemia in 2002 and died that same year. (R. Doc. 1). Thus, Plaintiff's claims are facially prescribed since they were filed well beyond one-year after Mr. Frank died. In fact, they were filed more than eight years after his death. The burden, therefore, is upon Plaintiff to demonstrate her claims are not prescribed. *See id.*

Plaintiff seeks to satisfy this burden by arguing the doctrine of contra non valentem prevented the running of prescription on her claims. Plaintiff includes in her Complaint allegations aimed at protecting her from a prescription attack. These allegations state,

> The prescriptive period does not start until the plaintiffs knew or should have known that the plaintiff's ALL Leukemia was caused by benzene. Here, the result of the plaintiffs [sic] exposure to benzene was inherently undiscoverable. The cancer took years to develop, and even when the symptoms did manifest, neither the physicians nor the plaintiffs detected the link between his benzene exposures and his malignancies. The [sic] Welman Frank never heard or saw anything that linked benzene to his malignancy. Mrs. Frank, Welman Franks [sic] widow, did not learn of a possible connection between the benzene Mr. Frank was exposed [to] and his illness until February of 2011. Mr. Frank's cancer was the product of exposure to these chemicals over a period of time rather than form [sic] a single point in time. Hence, the limitation period didn't start until

6

earlier this year when the plaintiff learned about the cause of his Leukemia.  (R. Doc. 1).

Under Louisiana law, "[t]o soften the occasional harshness of prescriptive statutes, our courts have recognized a jurisprudential exception to prescription: *contra non valenteum non currit praescriptio*, which means that prescription does not run against a person who could not bring his suit." *Carter*, 2004-0646 at p. 11; 892 So. 2d at 1268.  It "is a Louisiana jurisprudential doctrine under which prescription may be suspended." *Id*.  The Louisiana Supreme Court has recognized four instances in which the doctrine applies to prevent the running of prescription. *See id.*  Plaintiff urges two of these instances in opposition to Shell's Motion.  The first type is "where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action." *Id*.  The second is "where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant." *Id*.  The Court is to "weigh the equitable nature of the circumstances in each individual case to determine whether prescription will be tolled." *Id*.

Turning to the first of Plaintiff's arguments, the Louisiana Supreme Court has characterized this type of contra non valentem as "implicated only when, (1) the defendant engages in conduct which rises to the level of concealment, misrepresentation, fraud, or ill practice; (2) the defendant's actions effectually prevented the plaintiff from pursuing a cause of action; and (3) the plaintiff must have been reasonable in his or her inaction." *Marin v. Exxon Mobil Corp.*, 2009-2368, p. 24 (La. 10/19/10); 48 So. 3d 234, 252 (internal citations omitted).

In support of this first type of contra non valentem, Plaintiff alleges Shell fraudulently concealed the dangers of benzene, Shell failed to inform decedent of the dangers and health risks associated with benzene, and Shell failed to train its workers on the health risks of benzene.  In

response, Shell contends that because prescription is not tolled when a Plaintiff could have learned of the cause of his injuries through reasonable diligence, Plaintiff defeats her own argument by including in the Complaint allegations stating that the health hazards associated with benzene exposure have been recognized for over 100 years and this information has been publicly available and accessible.  Additionally, Shell claims Plaintiff's allegations against it do not rise to the level of fraud required for this type of contra non valentem to apply.

Plaintiff does not sustain her burden of demonstrating the applicability of this type of contra non valentem because she has not alleged Shell "effectually prevented" her from pursuing her claims.  *See Marin,* 2009-2368 at p. 24; 48 So. 3d at 252.  The jurisprudence creates a high threshold for this type of contra non valentem.  For example, it has been found applicable where there is an affirmative misrepresentation or lie on the defendant's part, *see Cross v. Alpha Therapeutic Co.*, 2000 WL 1140491, at *5 (E.D. La. Aug. 11, 2000), the defendant's tortious behavior produces the plaintiff's mental and/or physical inability to file suit, *see Plaquemines Parish Comm'n Council v. Delta Dev. Co., Inc*., 502 So. 2d 1034 (La. 1987)(citing *Corsey v. State Dep't of Corrs.*, 375 So. 2d 1319 (La. 1979)), or defendant threatens plaintiff against filing suit.  *See Nathan v. Carter*, 372 So. 2d 560, 563 (La. 1979).  In contrast, the doctrine has been held not applicable in instances where the defendant misled the plaintiff about the extent of the tortious harm, *see Marin*, 2009-2368 at p. 24; 48 So. 3d at 252, denied wrongdoing, *see High Tech Comm'ns v. Panasonic Co.*, 1995 WL 120154, at *2 (E.D. La. Mar. 17, 1995), or failed to warn of tortious aspects of a product and made false and fraudulent representations about safety and efficacy.  *See Pierce v. Am. Med. Sys., Inc*., 1997 WL 772816, at *6 (E.D. La. Dec. 15, 1997).  The present case is more analogous to these latter examples, assuming the Plaintiff's

version of the facts are correct, and thus, Plaintiff has not sustained her burden of demonstrating entitlement to this type of contra non valentem.

The Court now turns to the second type of contra non valentem urged by the Plaintiff, that resulting from lack of knowledge of a cause of action.  In support of this argument, Plaintiff claims there was no way to identify benzene exposure as the cause of Mr. Frank's cancer and eventual death, and she denies that Mr. Frank's diagnosis and death were tantamount to constructive notice, especially given her lack of advanced degrees and medical experience.  In response, Shell contends that because prescription is not tolled when a Plaintiff could have learned of the cause of the injuries through reasonable diligence, Plaintiff defeats her own argument by including in the Complaint allegations stating that the health hazards associated with benzene exposure have been recognized for over 100 years and that this information has been publicly available and accessible.

 "Louisiana courts have used the doctrine of contra non valentem to suspend the running of prescription when the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." *Bartucci*, 245 Fed. App'x at 257. As the Fifth Circuit recognizes, "'[m]ere apprehension that something might be wrong' does not make delay in filing an action unreasonable, nor does knowledge that one has a disease.  There must be knowledge of the tortious act, the damage caused by the tortious act, and the causal link between the act and the damage before one can be said to have 'constructive notice' of one's cause of action." *Ducre v. Mine Safety Appliances*, 963 F.2d 757, 760 (5th Cir. 1992).  "[T]he question is whether, in light of plaintiff's own information and the diagnoses he received, the plaintiff was reasonable to delay in filing suit." *Cole v. Celotex Corp.*, 620 So. 2d 1154, (La.

1993)(citing *Knaps v. B&B Chem. Co., Inc*., 828 F.2d 1138, 1140 (5th Cir. 1987)).  "In addition,

the ultimate issue...is the reasonableness of the plaintiff's action or inaction in light of his

education, intelligence, and the nature of the defendant's conduct."  *Marin,* 2009-2368 at p. 15;

48 So. 3d at 246.

In the Complaint, Plaintiff alleges that Mr. Frank's "cancer took years to develop, and

even when the symptoms did manifest, neither the physicians nor the plaintiffs detected the link

between his benzene exposures and his malignancies.  The [sic] Welman Frank never heard or

saw anything that linked benzene to his malignancy....until February of 2011."  (R. Doc. 1).

Taking these statements as true, as must be done in a Rule 12(b)(6) motion, the Court finds these

allegations are sufficient to demonstrate the applicability of contra non valentem to suspend the

running of prescription until February 2011[1], rendering Plaintiff's claims timely.  This version of

the doctrine known often as the "discovery rule" has traditionally applied in cases such as the

present involving long-latency, occupational diseases.  *See Becker v. Murphy Oil Corp*., 2010-

1519, p. 18 (La. App. 4 Cir. 6/2/11); 2011 WL 2164151, at *18.  Indeed, it has suspended

prescription even during the time the plaintiff has identified symptoms and has received a

diagnosis of his condition.  *See id.*; *Ducre*, 963 F.2d at 760-62; *Cole*, 620 So. 2d at 1157-58.

Shell challenges the application of the discovery rule, arguing Plaintiff had constructive

notice of her claims well before 2011, relying on her allegations that the dangers of exposure to

benzene have been well-known and publicly accessible decades before Mr. Frank was exposed

---

[1]Plaintiff alleges in her Response brief that she learned in February *2010* Mr. Frank's
illness and death could have been caused by his exposure to benzene at the Shell Norco refinery.
*See* (R. Doc. 21, p. 2).  If true, this would render Plaintiff's claims prescribed even under the
discovery rule of contra non valentem.  The Court will assume for purposes of the present
Motion this was a typographical error.

to benzene and was diagnosed with and died from ALL Leukemia.  The allegations at issue

provide,

> The health hazards of benzene have been recognized for over 100 years.  Benzene has been *medically recognized* as a carcinogen known to cause leukemia, and other blood diseases for decades.  By the end of 1948 it was widely known in the United States, to *those in defendants' industry*, as well as the named Defendants that exposure to benzene could cause a myriad of ill health effects including such diseases as leukemia and other blood disorders.

> Through *internal medical studies unknown to plaintiffs*, the defendants knew of the health hazards inherent in the products they manufactured, distributed, sold, supplied, owned, transported, or used.

> -     -     -     -     -     -     -     -     -     -     -

> The causal connection between injuries such as leukemia and benzene has been *scientifically documented* since the early 1900's.  (R. Doc. 1)(emphasis added).

Shell's argument ignores critical language in these allegations, particularly that stating the

benzene danger was well-known to Shell and others in similar industries, and that this danger

was scientifically and medically recognized, but not in studies of which Plaintiff was aware.  *See

id.* (noting emphasized language above).

Whether it was unreasonable for Plaintiff to be unaware of this information before the

expiration of prescriptive is based upon a number of factors.  Here, there are no allegations that

Plaintiff had access to or actually received the studies and information recognizing the cancer-

causing propensity of benzene.  *See Cross v. Alpha Therapeutic Co.,* 2000 WL 1140491, at *4

(E.D. La. Aug. 11, 2000).  Nor is there indication that this information was publicized or she was

given a warning by Shell.  *See In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 982 F.Supp.

388, 396 (E.D. La. 1997).  Plaintiff would not have known about this information as a lay person

outside of the medical and scientific fields.  *See Becker,* 2010-1519 at p. 19; 2011 WL 2164151,

at *44; *see also Ducre*, 963 F.2d at 761.  Based upon these factors, Plaintiff's claims are timely

pursuant to the discovery rule exception of contra non valentem.

Shell also argues that Plaintiff's survival action claims are peremptive and thus cannot be

interrupted or suspended under contra non valentem.  While there exists jurisprudence

supporting this argument, such predates or relies on precedent predating the amendment of the

survival action provision in Louisiana Civil Code article 2315.1.  *See e.g. Ayo v. Johns-Manville*

*Sales Corp.*, 771 F.2d 902, 906-08 (5th Cir. 1985); *In re Factor VIII or IX Concentrate Blood*

*Prods. Liab. Litig.*, 2000 WL 282787, at * (E.D. La. Mar. 14, 2000); *Adams v. Asbestos Corp.,*

*Ltd.*, 41,028 (La. App. 2 Cir. 5/17/06); 930 So. 2d 342, 344; *Woods v. Monroe Manor Nursing*

*Homes, Inc.*, 530 So. 2d 1221, 1222-23 (La. App. 2 Cir. 1988).  Indeed, the current version of

this Article states it has a "prescriptive period."  *See* La. Civ. Code art. 2315.1(C).

Contemporary jurisprudence and scholars have noted this change and interpret it as the

legislature's intent to designate the time period for filing a survival action as prescriptive rather

than peremptive.  *See Jackson v. Ace Am. Ins. Co.*, 2010 WL 451062, at *2-3 (W.D. La. Feb. 5,

2010); 12 William Crawford, *Tort Law in Louisiana Civil Law Treatise* § 5.9 (2d ed. 2011); *see*

*generally White v. Entergy Gulf States, Inc.,* 2003-2074 (La. App. 4 Cir. 6/16/04); 878 So. 2d

786,789; *Tuazon v. Eisenhardt*, 98-666 (La. App. 5 Cir. 12/16/98); 727 So. 2d 553, 555; *Tureaud*

*v. Acadiana Nursing Home*, 96-1262 (La. App. 3 Cir. 5/7/97); 696 So. 2d 15, 17-18.  Indeed, the

starting point for interpreting a statute is the language of the statute itself.  *See O'Regan v.*

*Preferred Enters., Inc.,* 98-1602 (La. 3/17/00); 758 So. 2d 124, 128.  Thus, Plaintiff's survival

actions claims contain a prescriptive period, not peremptive, and are subject to contra non

valentem.

12

3.      *Workers' Compensation*

Shell also seeks dismissal of Plaintiff's claims on the basis that they are barred by the exclusive remedy provision of the Louisiana Workers' Compensation Act ("LWCA").  It contends the intentional act exception to the LWCA does not apply to Plaintiff's claims.  In response, Plaintiff argues that the older version of the LWCA applies to her claims because the events giving rise thereto occurred prior to the 1976 revisions, and the pre-1976 version does not grant immunity to executive officers.  She also alleges the intentional tort exception to the LWCA does apply.

As a general matter, the LWCA provides the exclusive remedy to an employee for injury, sickness, or disease arising during the course and scope of employment.  *See* La. Rev. Stat. § 23:1032(A).  Plaintiff does not dispute Mr. Frank's alleged benzene exposure and later diagnosis of and death from ALL Leukemia constitute covered injury, sickness, or disease under the LWCA.[2]  Plaintiff does raise an objection as to Mr. Frank's employee status under the LWCA.

---

[2]Under the current version of the LWCA, a covered occupational disease is defined as a "disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, and employment in which the employee is exposed to such disease." La. Rev. Stat. § 23:1031.1(A)-(B).  As noted, Plaintiff does not argue Mr. Frank's benzene exposure and later development of ALL Leukemia are outside the definition of occupational disease under the current LWCA, thus the Court will assume they are covered for purposes of the present Motion.  This assumption appears to be consistent with the jurisprudence.  *See e.g. Benoit v. Turner Indus. Grp., LLC*, 2010-1450 (La. App. 3 Cir. 5/4/11); 63 So. 3d 442 (reviewing workers' compensation judge's conclusions regarding an employee's workplace-exposure to benzene and later development of AML leukemia); *Stutes v. Koch Servs., Inc.*, 94-782 (La. App. 3 Cir. 12/7/94); 649 So. 2d 987(finding benzene exposure and resultant CML leukemia covered by workers' compensation); *Shepherd v. Exxon Mobil Corp.*, 2009 WL 667180 (M.D. La. Mar. 12, 2009)(finding benzene exposure allegations governed by workers' compensation).  Additionally, because the pre-1975 version of the LWCA includes within coverage "aromatic...hydrocarbons," of which benzene is composed, *see* Safety and Health Topics: Benzene, Occupational Safety & Health Administration, United States Department of Labor, http://www.osha.gov/SLTC/benzene/ (last visited Oct. 17, 2011), it logically follows

Plaintiff argues her claims arising from Mr. Frank's time at the Norco refinery from 1972-1973 as a contract worker are not governed by the LWCA because Mr. Frank was not a statutory employee of Shell. In response, Shell argues Mr. Frank would have been a statutory employee under the version of the LWCA in effect during his contract work, and thus, the claims arising from this time period are barred by the LWCA. The Court agrees with Shell that the LWCA in effect at the time of Mr. Frank's work determines his employment status. *See Emery v. Owens-Corp.*, 2000-2144, p.6 (La. App. 1 Cir. 11/9/01); 813 So. 2d 441, 448 (applying LWCA in effect at time employee worked to determine his statutory employee status); *accord Terrance v. Dow Chem. Co.*, 2006-2234 (La. App. 1 Cir. 9/14/07); 971 So. 2d 1058. The applicable version provides,

> 'That where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as a contractor) for the execution by or under the contract of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or his dependant any compensation under this act which he would have been liable to pay if that employee had been immediately employed by him.' *Thibodaux v. Sun Oil Co.*, 49 So. 2d 852, 853 (La. 1950)(citing LWCA provision regarding its application to employees of independent contractors, current Louisiana Revised Statute 23:1061).

Here, Plaintiff alleges "Mr. Frank worked as a contract worker at the Shell Norco refinery from 1972 to 1973. He was tasked with cleaning out storage tanks." (R. Doc. 1). She also alleges Mr. Frank conducted the same task of cleaning tanks when he became an employee of Shell. *See id.* This indicates that as both a contract worker and an employee at Shell, Mr. Frank was doing work which was part of the "trade, business or occupation of the principal." *See e.g. Thibodaux,*

---

benzene would be covered by the broader post-1975 version of the Act.

49 So. 2d at 853-54.  Thus, Mr. Frank constituted a statutory employee during his time as a

contract worker at the Norco refinery from 1972-1973, and this time period will be treated the

same as his other years working at the refinery under the LWCA analysis.

Since the LWCA came into existence, particularly during the course of Mr. Frank's

employment at the Norco refinery, the Act has undergone several significant changes.  Thus, as a

threshold matter, the question of which version or versions of the LWCA apply to Plaintiff's

claims must be resolved.  This is particularly important here for determining, (1) whether

Plaintiff can pursue her tort claims against Shell's executive officers, and (2) whether the

intentional tort exception applies to Plaintiff's tort claims, *see Bazley v. Tortorich*, 397 So. 2d

475, 479 (La. 1981), each of which are now addressed in turn.

It is well settled that the LWCA generally applies as the exclusive remedy for both

wrongful death and survival actions filed by the survivors of an injured worker, the very claims

at issue here.  *See Deshotel v. Guichard Operating Co., Inc.*, 2003-303 (La. App. 3 Cir.

11/19/03); 861 So. 2d 697, 701; *Callaway v. Anco Insulation, Inc.*, 98-0396 (La. App. 4 Cir.

3/25/98); 714 So. 2d 730.  However, determining which version of the LWCA applies to each

type of claim follows a different analysis.

With regard to Plaintiff's wrongful death claims, the Louisiana Supreme Court has held

that the LWCA in effect during the time of death is applicable.  *See Walls v. Am. Optical Corp.*,

98-0455 (La. 9/8/99); 740 So. 2d 1262, 1265-75.  Here, Mr. Frank died in 2002; thus the current

version of the LWCA applies to Plaintiff's wrongful death claims.  *See* La. Rev. Stat. § 23:1031.

Because the current version of the LWCA does not exclude from coverage claims against

executive officers, *see Bazley,* 397 So. 2d at 479, Plaintiff's wrongful death claims against Shell

and its executive officers are governed exclusively by the LWCA and cannot proceed in this Court unless the intentional tort exception discussed below applies.

With regard to the Plaintiff's survival action claims, the applicable law is that in place at the time of exposure as determined under the "significant tortious exposure theory." *See Austin*, 2001-1598, at pp. 25-26; 814 So. 2d at 1154; *see also Spillman v. Anco Insulations, Inc*., 2007-0763 (La. App. 1 Cir. 9/9/08); 994 So. 2d 132, 134 ("A [survival] cause of action accrues in a long-latency occupational disease once there has been a significant tortious exposure."); *Alexander v. Thiokol Corp.*, 2004-625 (La. App. 3 Cir. 11/10/04); 887 So. 2d 685, 689 ("'[I]n resolving latent long-term toxic torts courts must apply the law that was in effect at the time of the significant causative exposure.'"); *Abadie v. Metropolitan Life Ins. Co.*, 00-352 (La. App. 5 Cir. 4/11/01; 804 So. 2d 11, 19("[A] survival action arises when the injured party is exposed to the toxic substances which cause the disease...governed by the workers' compensation statute which was in effect at the time the decedent was exposed."). Under this theory, "when a cause of action accrued in a long-latency occupational disease case in which the plaintiff suffers from an illness or disease is when the exposures are 'significant and such exposures later result in the manifestation of damages.'" *Id*. Shell bears the burden of proving Plaintiff's survival action accrued post-1976, granting it immunity. *See Spillman*, 2007-0763, at p. 3; 994 So. 2d at 134 (citing *Austin v. Abney Mills, Inc*., 01-1598, pp. 7-8 (La. 9/4/02); 824 So. 2d 1137, 1143).

Plaintiff alleges Mr. Frank was exposed to benzene while working at Shell from 1972 to 2002. (R. Doc. 1). The LWCA in effect from 1972 to 1975 excepted from coverage claims against executive officers, but with the 1976 amendments executive officers were treated the same as employers covered by the Act. *See Bazley*, 397 So. 2d at 479. Thus, because the

LWCA has always been the exclusive remedy for claims against employers, *see generally id.*, Plaintiff's survival action claims against Shell itself are dismissed.  With regard to Plaintiff's survival action claims against Shell's executive officers, however, Shell must demonstrate that all of Mr. Frank's significant tortious exposure to benzene occurred after 1975 in order for these officers to be entirely immune from Plaintiff's survival claims.  *See id.*; *Austin*, 2001-1598, at pp. 25-26; 814 So. 2d at 1154.  There has been no such showing on Shell's part; thus, dismissal of Plaintiff's survival claims against Shell's executive officers, arising from Mr. Frank's work at the Norco refinery from 1972 to 1975, is not appropriate since it is possible Mr. Frank suffered significant tortious exposure during this time period.  *See Ducre v. Exec. Officers of Halter Marine, Inc.*, 752 F.2d 976, 981 (5th Cir. 1985); *Walls v. Am. Optical Corp.*, 98-0455 (La. 9/8/99); 740 So. 2d 1262, 1265-75; *Deshotel v. Guichard Operating Co., Inc.*, 2003-303 (La. App. 3 Cir. 11/19/03); 861 So. 2d 697, 701; *see e.g. Bourgeois v. A.P. Green Indus.*, 02-713 (La. App. 5 Cir. 2/25/03); 841 So. 2d 902, 909-10.  However, Plaintiff can pursue her survival claims, as with the wrongful death claims, only if the intentional tort exception applies.

In 1976 the Louisiana Legislature codified an exception to the exclusivity provisions of the LWCA for when the employee's injury or disease is caused by an intentional tort.  *See* La. Rev. Stat. § 23:1032(A); *Zimko v. Am. Cyanamid*, 2003-0658 (La. App. 4 Cir. 6/8/05); 905 So. 2d 465, 475; *Callaway v. Anco Insulation, Inc.*, 98-0396 (La. App. 4 Cir. 3/25/98); 714 So. 2d 730, 733.  Thus, if Plaintiff's wrongful death and survival action claims against Shell arising from Mr. Frank's alleged benzene exposure from 1976 onward constitute intentional torts, these claims are not precluded by the LWCA and can proceed before this Court.  Because this exception did not take effect until 1976, Plaintiff's claims arising prior to its enactment are

dismissed, though, as noted above, the survival claims against Shell's executive officers arising prior to 1976 survive dismissal in their own right.  But, the question remains whether the Plaintiff can demonstrate the actions constituted intentional torts.

In the context of the LWCA, the Louisiana Supreme Court defines an intentional tort as occurring when "the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result." *Bazley*, 397 So. 2d at 481.  Plaintiff only raises an argument under the latter exception.  *See* (R. Docs. 1, 21).  "Louisiana courts narrowly construe the intentional act exception." *Zimko*, 2003-0658, at p. 11; 905 So. 2d at 475 (citing *Reeves v. Structural Pres. Sys.*, 98-1795, p.6 (La. 3/12/99); 731 So. 2d 208, 211).  The plaintiff bears the burden of demonstrating the work-related injury resulted from an intentional act. *Mayer v. Valentine Sugars, Inc.*, 444 So. 2d 618 (La. 1984).

Under the substantially certain exception, the jurisprudence requires more than a reasonable probability that an injury will occur and defines "certain" to mean "inevitable" or "incapable of failing." *Zimko*, 2003-0658, at p. 12; 905 So. 2d at 476.  "Mere knowledge and appreciation of a risk does not constitute intent, nor does reckless or wanton conduct by an employer constitute intentional wrongdoing." *Reeves*, 98-1795 at p. 10; 731 So. 2d at 213. "'Even if the alleged conduct goes beyond aggravated negligence, and includes such elements as knowingly permitting a hazardous work condition to exist, knowingly ordering claimant to perform an extremely dangerous job, or willfully failing to furnish a safe place to work, this still falls short of the kind of actual intention to injure that robs the injury of accidental character.'"

18

*Reeves*, 98-1795, at p.5; 731 So. 2d at 210 (quoting 2A Larson, *Workmen's Compensation Law* §
68.13 (1989)). "[A]lmost universally," Louisiana courts hold "that employers are not liable
under the intentional act exception for violations of safety standards or for failing to provide
safety equipment." *Reeves*, 98-1795 at p. 7-8; 731 So. 2d at 211-12. "Believing that someone
may, or even probably will, eventually get hurt if a workplace practice is continued does not rise
to the level of an intentional act, but instead falls within the range of negligent acts that are
covered by workers' compensation." *Reeves*, 98-1795 at p. 9; 731 So. 2d at 212. "Louisiana
courts have distilled...dangerous work place situations [] almost universally do not form the basis
for an intentional act," including "[f]ailure to provide a safe place to work." *Zimko*, 2003-0658,
at p. 11; 905 So. 2d at 475 (citing William E. Crawford, *Tort Law in Louisiana Civil Law
Treatise* § 23.3 (2000)).

> Here, the Complaint alleges in the "Intentional Tort" section,

> Shell was well aware of the serious health hazards associated with the use of benzene.
> Consequently, if companies such as Shell had concern for the health and well-being of
> workers using and/or being exposed to benzene and benzene-containing products, they
> should have provided information and warnings on the need to limit exposures, educated
> workers, measured airborne exposure levels, provided adequate and safely designed
> protective equipment, and conducted medical examinations.

> The actions and inactions of the [sic] Shell and its executive officers, whether taken
> separately, or together, were of such character as to constitute a pattern or practice of
> intentional wrongful conduct and/or malice resulting in damage and injury to the
> Plaintiffs. More specifically, Shell and its executive officers, consciously and/or
> deliberately engaged in oppression, fraud, wantonness and/or malice with regard to
> Welman Frank and other employees. Therefore, Shell should be held liable for the
> intentional infliction of physical injury upon its employee, Mr. Welman Frank. (R. Doc.
> 1).

In a later section of the Complaint, entitled "Shell Benzene Industrial Hygiene" Plaintiff appears

to add further intentional tort allegations, including,

Shell intentionally exposed Mr. Frank to benzene and benzene-containing products by the conditions of work it imposed upon him.  Shell actually knew that he [sic] conditions of work would cause exposure to benzene and benzene-containing products, and that such exposure would cause injury.  Exposure to benzene and benzene-containing products is a harmful or offensive bodily contact.  Shell knowingly and intentionally exposed Mr. Frank to benzene and benzene-containing products that caused injury.  Mr. Frank's exposure lead directly to the development of ALL Leukemia.  Therefore, [Shell] intentionally exposed Welman Frank to benzene and benzene containing products with the knowledge that such exposure was substantially certain to cause serious injury to Mr. Frank including damage to his blood.

Shell knew within a substantial certainty that the conditions of work which it imposed upon Mr. Frank and over which it had total control, would result in offensive touching, offensive contact and exposure to benzene and benzene-containing products.  For many years, the [sic] Shell actually knew that exposure to benzene and benzene-containing products could naturally, directly and probably result in the disease of ALL Leukemia in a person who received exposure or offensive touching and contact.  However, Shell intentionally chose to continue its course of conduct and allowed workers such as Mr. Frank to be exposed to benzene and benzene-containing products.

The above conduct, as well as other conduct on the part of (sic) the Shell, constitutes outrageous conduct and conduct which Shell knew to a substantial certainty would cause exposure to benzene and benzene-containing products from which all manner of damages would flow, including, but not limited to:
    a. Benzene and benzene-containing products-related disease;
    b. Leukemia, blood disorders, other related conditions, resulting pain, suffering and mental anguish;
    c. Emotional distress.  (R. Doc. 1).

Plaintiff also alleges, based upon exhibits to her Complaint, that Shell prepared memoranda regarding and had reported knowledge that exposure to benzene causes blood diseases and disorders and certain cancers, but that Shell concealed such information.  *See* (R. Doc. 21).

Based upon the foregoing, Plaintiff has not sufficiently alleged intentional tortious behavior on the part of Shell to prevent dismissal of her post-1975 claims.  These allegations do not demonstrate Shell was "substantially certain" Mr. Frank would be diagnosed with ALL Leukemia due to his exposure to benzene and benzene-related substances, but rather indicate that Shell "knowingly permitt[ed] a hazardous work condition to exist, knowingly order[ed] claimant

20

to perform an extremely dangerous job, or willfully fail[ed] to furnish a safe place to work," all of which the Louisiana Supreme Court holds is insufficient for an intentional tort. *See Reeves*, 98-1795, at p.5; 731 So. 2d at 210; *see also Zimko*, 2003-0658, at pp. 10-18; 905 So. 2d at 475-80; *Perret v. Cytec Indus., Inc.*, 04-745 (La. App. 5 Cir. 11/30/04); 889 So. 2d 1121, 1125-26. Plaintiff claims she has alleged battery by Shell, but has failed to put forth more than conclusory allegations that Shell believed it was substantially certain Mr. Frank would develop and later die from ALL Leukemia due to his exposure to benzene. *See Bulot v. Intracostal Tubular Servs., Inc.*, 98-2105 (La. App. 4 Cir. 2/24/99); 730 So. 2d 1012, 1018-19, *remanded on other grounds*, 99-0880 (La. 11/19/99); 749 So. 2d 659. Plaintiff even contradicts her "substantially certain" claim by alleging, "Shell actually knew that exposure to benzene and benzene-containing products *could naturally, directly and probably* result in the disease of ALL Leukemia, (emphasis added)," *see Reeves*, 98-1795 at pp. 7-8; 731 So. 2d at 211-12 (believing employees probably will get hurt is not an intentional tort), which is insufficient to meet the standard of "inevitable" or "incapable of failing." *Zimko,* 2003-0658, at p. 12; 905 So. 2d at 476. Further, benzene exposure in the workplace which leads to a latent cancer in the employee has been treated by courts as a covered occupational disease under the LWCA. *See e.g. Shepherd v. Exxon Mobil Corp. SGS N. Am., Inc.,* 2009 WL 667180, at *4 (M.D. La. Mar. 12, 2009); *Stutes v. Koch Servs., Inc*., 94-782 (La. App. 3 Cir. 12/7/94); 649 So. 2d 987, 990-91.

The cases relied upon by Plaintiff to support her intentional tort argument are all factually distinguishable from the present case. For example, in *Swope v. Columbian Chemicals Co.*, 281 F.3d 185, 194-95 (5th Cir. 2002), the alleged exposure to ozone in the workplace caused the employees immediate "respiratory discomfort, 'choke ups,' nausea, headaches, and chest pains.

On at least three occasions, employees....had passed out from breathing too much ozone and had been taken to hospital emergency rooms or given oxygen on the plant premises. Many other times, employees had to flee the immediate vicinity." This differs from the present case where Plaintiff does not allege any instances of injury or health problems while Mr. Frank was working at Shell which would suggest Shell knew to a substantial certainty that the benzene exposure would cause cancer or leukemia. The other cases cited by Plaintiff similarly involve allegations of employees sustaining open or apparent injury or illness while working, which the employer failed to remedy or ordered the employee to continue working despite these effects. *See e.g. Belgard v. Am. Freightways, Inc*., 99-1067 (La. App. 3 Cir. 12/29/99); 755 So. 2d 982 (reversing summary judgment in favor of an employer when the employee suffered injuries after being ordered by employer into area of toxic fumes just evacuated to protect other workers); *Trahan v. Trans-La. Gas Co., Inc*., 618 So. 2d 30 (La. App. 3 Cir. 1993)(reversing an exception of no cause of action where employer ordered employee to proceed with work involving exposure to chemicals when employer knew employee became ill on two prior occasions after such exposure); *Major v. Fireman's Fund Ins. Co.*, 506 So. 2d 583 (La. App. 4 Cir. 1987)(reversing summary judgment in favor of an employer who ordered an employee to work on hot rollers after being informed employee could not work around chemicals pursuant to doctor's order, the mask was not working, and saw employee's nose bleeding). Thus, the Court finds that the intentional tort exception does not apply to Plaintiff's claims against Shell arising from Mr. Frank's alleged exposure post-1976, and thus, dismissal of these claims is appropriate.

## III.   SHELL'S MOTION TO STRIKE

Shell filed a Motion to Strike, seeking an order from the Court striking from the

Complaint a number of allegations and supporting exhibits.  (R. Docs. 19, 31).  Plaintiff opposes

Shell's Motion.  (R. Doc. 20).

   **A.   Law & Analysis**

      *1.   Motion to Strike*

   A motion to strike filed pursuant to Federal Rule of Civil Procedure 12(f) provides that a

"court may strike from a pleading an insufficient defense or any redundant, immaterial,

impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The decision to grant or deny a

motion to strike lies within the sound discretion of the trial court.  *Admin'rs of the Tulane Educ.*

*Fund v. Biomeasure, Inc.*, 2011 WL 3268123, at *2 (E.D. La. July 28, 2011)(citing *Tarver v.*

*Foret*, 1996 WL 3536, at *1 (E.D. La. Jan. 3, 1996)).  "[M]otions to strike under Rule 12(f) are

disfavored and 'should be used sparingly by the courts' because they are considered a 'drastic

remedy to be resorted to only when required for the purposes of justice.'"  *Id*. (quoting *Pan-Am.*

*Life Ins. Co. v. Gill*, 1990 WL 58133, at *2 (E.D. La. Apr. 27, 1990)); *accord Harris v. USA Ins.*

*Companies*, 2011 WL 3841869, at *1 (E.D. La. Aug. 30, 2011).  "A motion to strike should be

granted only when 'the allegations are prejudicial to the defendant or immaterial to the lawsuit.'"

*Harris*, 2011 WL 3841869, at *1 (quoting *Johnson v. Harvey*, 1998 WL 596745, at *7 (E.D. La.

1998)).          Substantial portions of Plaintiff's Complaint contain "evidence pleading, as

distinguished from the pleading of ultimate facts, [which] is not favored under the Federal

Rules."  *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1169 (5th Cir. 1979).  "[U]nnecessary

evidentiary details are usually not stricken from the complaint unless prejudicial or of no

consequence to the controversy," *see id.* at 1168-69, but at the same time, "[m]any courts have

properly stricken unnecessary evidentiary detail from pleadings."  *Id*. at 1169.  "[A] district

court's order striking pleadings does not control the issues of materiality and relevancy that govern the admissibility of the evidence....The plaintiffs need not plead these matters." *Id.*

> 2.      *Analysis*

Shell raises nine arguments in support of its Motion.  The Court will summarize each of these arguments in turn, Plaintiff's responses thereto, and issue rulings based upon the relevant facts and applicable law.

> a.      Dr. Joyner's Deposition Testimony

 First, Shell argues the allegations referencing the deposition testimony of Dr. Roy Joyner in the *Bishop* litigation should be stricken because they mischaracterize the substance and source of Dr. Joyner's testimony, are prejudicial and scandalous, and have no bearing on the issues raised in the present litigation.  In response, Plaintiff argues these allegations and supporting testimony are relevant to her fraudulent concealment, contra non valentum, failure to warn, and intentional tort claims.

The allegations in the Complaint at issue provide,

> 42.     On August 01, 1977, Dr. Joyner and Dr. Stallones testified under oath that Shell did not have any other cases of blood dyscrasia other than the leukemia cases presented to OSHA.

> 43.     Shell failed [sic] disclose the 8 cases of multiple myeloma, and the 18 cases of lymphoma to OSHA at the Temporary Benzene Standard Hearings.  (R. Doc. 1).

These allegations directly cite to the deposition testimony of Dr. Joyner taken in previous litigation in 2009, not testimony from the OSHA hearings.  *See* (R. Doc. 1-9).  Therein, Dr. Joyner was posed the following question by counsel, who is also Plaintiff's counsel in the present litigation, "[w]hy didn't Dr. Stallones inform the OSHA panel that there were 8 cases of myeloma and 18 cases of lymphoma in–at that hearing?...did anyone tell him not to inform the

24

panel that?"  *Id*. at pp. 34:24-35:6.  In response, Dr. Joyner stated "[n]ot to my knowledge."  *Id.*
at 35:7.  Dr. Joyner was then asked, [d]id you inform the panel on that day that you had 8 cases
of myeloma and 18 cases of lymphoma?" to which Dr. Joyner answered "I don't recall."  *Id*. at
35:8-10.  This testimony is not supportive of Plaintiff's allegations.

Plaintiff directs the Court's attention to previously unreferenced portions of Dr. Joyner's
deposition, particularly the section in which the questioning attorney appears to be reading Dr.
Joyner's testimony from the 1977 OSHA hearing.  This section provides, "Ms. Murray, question,
'Were there any other deaths attributable to blood dyscrasias?'  First, Dr. Stallones says, 'There
certainly were.  The particular focus was on leukemia, and I did not have any great detail on the
other causes of death.'"  *Id.* at 34:16-21.  This fails to support the allegations in the Complaint.
For one, Dr. Joyner did not testify in the 2009 deposition as to what he or Dr. Stallones said at
the 1977 OSHA hearing, rather the questioning counsel allegedly read from the transcript of the
hearing.  This constitutes hearsay, is unauthenticated, and cannot be attributed to testimony of
either Dr. Joyner or Dr. Stallones.  Further, the condition of which Mr. Frank died was ALL
Leukemia so it is immaterial to the present litigation even if there existed other undisclosed
causes of death.

Plaintiff also cites to other areas of Dr. Joyner's deposition testimony, claiming such
demonstrates Shell withheld information regarding employees developing leukemia and other
conditions.  However, upon review of this testimony, Dr. Joyner does not recollect whether Shell
had non-leukemia cases of blood dyscrasia and testifies only leukemia information was sent to
OSHA because it was requested.  *See id.*  The only evidence of the 8 cases of multiple myloma
and 18 cases of lymphoma allegedly withheld is contained in a study read into the record by the

questioning attorney.  *See id.*  If this study is the basis of Plaintiff's allegations, it should be attached to the Complaint, because as it stands now it constitutes hearsay and unauthenticated evidence.

Plaintiff also cites to a letter from the U.S. Department of Labor, Occupational Safety and Health Administration, to Shell's Manager of Product Safety and Compliance on December 22, 1982, containing information regarding employee deaths attributable to leukemia, among other causes.  *See* (R. Doc. 1-13).  A letter written by OSHA to Shell in 1982 would have no bearing on the testimony at the 1977 OSHA hearing.

Based upon the foregoing, the Court finds paragraphs 42 and 43 of the Complaint are to be stricken.  These allegations mischaracterize the supporting evidence and are prejudicial to Shell.  They are also immaterial since they involve failure to disclose conditions and diseases which are not at issue in the present litigation.

> b.      Medical Surveillance Database

Second, Shell argues that Exhibit 1, entitled "Shell Oil Co. Medical Surveillance Database for Multiple Myeloma" and references to this exhibit should be stricken because they are immaterial to the claims in the present suit, pertaining rather to multiple myeloma which was at issue in the *Bishop* litigation.  In response, Plaintiff argues that Exhibit 1 provides an example of the type of information Shell had access to and is relevant to demonstrate Shell's fraudulent concealment, failure to warn, and intentional tort in exposing its workers to benzene while failing to inform of the dangers thereof.

The specific allegations at issue provide,

13.      The Defendants knew that Shell employees were developing blood disorders and cancers at the Norco, Louisiana facility prior to 1960.  Shell failed to warn its'

26

[sic] workers that Shell employees were contracting AML, ALL, CLL, CLM and other forms of leukemia; aplastic anemia; myelodysplastic syndrome; lymphoma, and other one hundred and fifty (150) cases of multiple myeloma from 1960 through 2009.

38.     In 1961, Shell Oil Co. documented the first employee case of multiple myeloma.

54.     Shell documents released in 2009 show that Shell employees with 20-29 years of service include 45 cases of multiple myeloma; and employees with 30-39 years of service include 67 cases of multiple myeloma.

55.     Shell documents released in 2009 list the deaths of Shell Oil employees from multiple myeloma in 2009 as follows: 37 deaths of Shell employees in the 1980's; 45 deaths of Shell employees in the 1990's and 49 deaths of Shell employees from 2000 through 2009.  These documents show one hundred and fifty (150) deaths of Shell employees from multiple myeloma from 1961 through 2009 which included statistically significant excesses for many of the years.

56.     Shell [sic] date produced in 2009 documents employee deaths from multiple myeloma as follows: 24 cases at Deer Park, 5 cases at Martinez, 6 cases at Norco, 11 cases at Wood River, and 104 cases at other Shell facilities.  (R. Doc. 1).

Each of these allegations cites to Exhibit 1 to the Complaint which is entitled "The FREQ

Procedure."   It is Bates numbered for the 2009 *Bishop* litigation and contains a series of charts.

It contains no mention of Shell, benzene, ALL Leukemia, or multiple myeloma.  Without further

authentication or explanation, the Court is unable to confirm that the data in Exhibit 1 supports

the subject allegations.  Further, these allegations largely pertain to multiple myeloma, which

was at issue in the *Bishop* litigation, but is not here.  Accordingly, these allegations are stricken

as both prejudicial to Shell and immaterial to the present litigation.  However, at this juncture the

Court makes no ruling as to the admissibility of Exhibit 1 at trial since a decision on this issue is

premature.

> c.     C.H. Hines Letter

Third, Shell argues paragraph 37 and Exhibit 4, a letter from C.H. Hines on Shell

27

letterhead, should be stricken because they mischaracterize the content of Exhibit 4 which states benzol will not cause cancer and no medical opinions exist connecting benzene with leukemia. In response, Plaintiff argues she did not mischaracterize the substance of Exhibit 4 and that Shell's argument fails because she is only required to plead a short and plain statement of the claims.  She claims Exhibit 4 demonstrates Shell knew about the dangers of benzene but refused to acknowledge or inform its employees of these dangers, supporting her claims of failure to warn and intentional tort.

Paragraph 37 of the Complaint states, "[i]n 1957, CH Hines reported that Shell Oil Co, has known for years that benzene causes damage to the blood.  Yet, by 1957 Shell was not informing workers of the health hazards and dangers of benzene."  (R. Doc. 1).  Only the first sentence cites to Exhibit 4, which is a letter dated January 22, 1957, from C.H. Hine, M.D., Ph.D., Consultant on Occupational Health & Industrial Toxicology for the Shell Development Company, to Mr. G.W. Waters of Shell Oil Company.  *See* (R. Doc. 1-6).  Therein, Dr. Hine states "[i]t has been known for many years that benzol will cause a reduction in the number of red and white cells and some reduction of the lymph tissues.  However, these findings are reversible and are not of a malignant or cancerous type."  *Id.*  The letter also acknowledges "the suggested connection between benzol exposure and leukemia" in reports/literature, but discounts such as lacking evidence.  *See id.*  The Court finds that paragraph 37 is properly based upon the letter from Dr. Hines and does not contain prejudice or immateriality.  Thus, the Court declines to strike either under Rule 12.

### d.      Internal Training Manual

Fourth, Shell argues the allegations in paragraph 46 and portion of Exhibit 10 should be

28

stricken because, contrary to Plaintiff's description, there is no "internal training manual" in Exhibit 10, but rather the document at issue was authored by a company called Envirohealth, Inc., and there is no evidence Shell knew about or used this document.  In response, Plaintiff argues the document is clearly labeled as a Shell document and was sent to numerous Shell staff. According to Plaintiff, attached to this document is a study reporting a higher incidence of certain leukemia in refinery workers.  Shell filed a Reply brief clarifying it is not objecting to the characterization of the documents in pages 1-2 of Exhibit 10, but rather it is objecting to the attribution of pages 13-21, the Envirohealth, Inc. report, as a Shell training manual and the imputation of any statements in those pages to Shell.

Paragraph 46 states "[i]n 1981, Shell Oil Co. circulated a memo stating that statistically significant increases in multiple myeloma and Lymphoblastic leukemia were found in a study, and an internal training manual says benzene causes multiple myeloma and leukemia [sic] Shell failed to inform it [sic] worker's [sic] including Mr. Frank of the findings."  (R. Doc. 1).  Shell does not dispute the first clause of this allegation; nor does the Court find a basis therefore since the internal Shell memo does state "statistically significant increases in cancer incidence were observed for lymphocystic leukemia in refinery workers, multiple myeloma in petrochemical workers, and melanoma in those plants reporting from the middle Atlantic Region.  Non-lymphocystic leukemia, especially granulacystic or myelogenous leukemia was not increased to statistically significant levels: It is this latter form of leukemia which is sometimes implicated in benzene exposure."  (R. Doc. 1-12).

With regard to the second clause of paragraph 46, Plaintiff characterizes a second attachment to the Shell internal memo, which is not referenced in the memo, as an "internal

training memo" presumably because of a hand-written note on the front of the document stating "respiratory training (keep per eip.; ≥75 yrs." *See id.* at p. 13.  However, as Shell notes there is not indication that this report, authored by "Envirohealth, Inc.," was a Shell document or used by Shell to train its employees.  This causes prejudice to Shell and requires striking the second clause of paragraph 46.  However, the Court reserves ruling at this time on the admissibility of the alleged internal training memo itself.

e.      Tsai Deposition Testimony

Fifth, Shell argues paragraphs 63-65 referencing the deposition testimony of Shan Tsai, Ph.D. from the *Bishop* litigation found in Exhibit 18 should be stricken because Plaintiff's allegations mischaracterize this testimony which only involves multiple myeloma, rending it immaterial to the present claims and prejudicial to Shell.  In response, Plaintiff argues her allegations should not be stricken because Dr. Tsai testified that the mortality/medical surveillance records were from Shell's own database and that Shell failed to disclose injuries and deaths in its study to the EPA.

The allegations at issue state,

63.    Dr. Shan Tsai, Manager of Epidemiology for Shell Oil Co. testified that he began working in the Epidemiology Department at Shell Oil in 1988.  Dr. Tsai testified that Shell Oil has not conducted a single study of Shell employees that died of multiple myeloma.  Shell failed to conduct a study of employees that developed ALL Leukemia.

64.    Dr. Tsai testified that Shell has never attempted to calculate the incidence rate for the 150 deaths of multiple myeloma.

65.    Dr. Tsai testified that the Shell Oil Epidemiology Department does not reports cases of multiple myeloma to the USEPA under the Toxic Substance Control Act. (R. Doc. 1).

To the extent these allegations pertain to multiple myeloma, the Court finds they should be

30

stricken since multiple myeloma is not involved in the present matter and references thereto may

prejudice Shell.  Further, because Dr. Tsai's testimony is void of any mention of ALL Leukemia

to the extent Plaintiff attributes the ALL Leukemia allegation to the testimony of Dr. Tsai, such

should be stricken as well.

f.      Litigation Strategy Documents

Sixth, Shell argues paragraph 69 and Exhibit 26 should be stricken because the "Shell

litigation strategy documents" upon which these items are based are undated and unauthenticated

and contain an express disclaimer that the contents thereof do not represent the views of Shell.

In response, Plaintiff argues the litigation strategy documents are relevant because they are

evidence of Shell's strategies to confuse, obfuscate, and mislead courts and juries as to the truth

of benzene.

Paragraph 69 provides

In a final example of the pattern of fraudulent concealment that has been ongoing for
decades, Shell litigation strategy documents calls [sic] for concealing sensitive
documents and leaves the reader with a poem to further instruct counsel to confuse the
trier of fact on the relationship between blood cancers and diseases as follows: 'SMOKE
SCREEN' 'One fine morning in the middle of the night Two dead boys got up to fight.
Back-to-back they faced each other, Drew their swords and shot each other, A deaf
policeman heard the noise And came and shot the two dead boys.  If you don't believe
my tale is true, Ask the blind man, he saw it too.' (R. Doc. 1).

Exhibit 26 from which this allegation quotes is a document by Richard G. Faulk entitled

"Benzene Litigation: Duties, Defenses and Strategies."  (R. Doc. 1-28).  The documents also

states that Mr. Faulk is the senior litigation attorney for Shell, and notably that "the opinions

expressed herein are solely those of the author and do not necessarily represent the views of

Shell Oil Company."  *Id.*  Thus, because this "poem" and other information in Exhibit 26 cannot

be attributed to Shell, but only to an individual attorney, the Court strikes paragraph 69 and

31

Exhibit 26.  Further, the Court finds the "poem" to be immaterial to the present litigation.

<b>g.</b>        <u>Affidavit of Frank M. Parker, III</u>

Seventh, Shell argues paragraph 99 and Exhibit 20, the affidavit of Frank M. Parker, III,

upon which this paragraph relies, should be stricken because they are not based upon personal

knowledge, and contain irrelevant and immaterial information and improper legal conclusions.

Specifically, Shell complains Mr. Parker lacks personal knowledge because he has never been to

the Shell Norco facility and his testimony involves pipefitting which is not at issue in the present

matter.  In response, Plaintiff argues Mr. Parker, as a high-level industrial hygienist for Shell,

had personal knowledge of Shell's health and safety practices.

Paragraph 99 provides,

Frank Parker, III, former manager of Shell Oil Co.'s Industrial Hygiene Program testified
that: 1) Shell did not have a [sic] industrial hygienist stationed in Norco until the late
1970's'; 2) Shell resisted the 1977 benzene standard; 3) Shell Norco had inadequate
resources to protect workers at Norco from Benzene exposure; 4) Shell failed to evaluate
the risks at Norco to protect the workers from benzene exposure; 5) Shell did provide
personal protective equipment to protect workers from benzene exposure[3]; 6) economic
and management decisions resulted in exposure of workers to benzene at Norco; 7) Shell
made a decision not to warn workers of benzene exposure dangers in the 1970's; 8)
pipefitters at Shell Norco were exposed to benzene vapors on a regular and frequent
basis; 9) Shell knew that pipfitters [sic] were regularly exposed to unsafe levels of
benzene exposure at Norco; 10) Shell failed to warn pipefitters of the dangers of benzene;
and 11) Shell knew of the health hazards associated with benzene exposure including
aplastic anemia and leukemia prior to the 1970's.  (R. Doc. 1).

Exhibit 20, Mr. Parker's affidavit, supports the allegations in paragraph 99.  *See* (R. Doc. 1-22).

Given Mr. Parker's role at Shell as the Director of the Corporate Industrial Hygiene Laboratory,

the Court finds he would likely have personal knowledge of the health and safety practices of the

---

[3]The Court assumes Plaintiff meant for this allegation to be in the negative form, that is
that Shell did "not" provide personal protective equipment.

Shell Norco facility, including with regard to benzene.  *See id.*  However, the Court finds the allegations regarding pipefitters at Norco to be immaterial to the present litigation since there is no allegation Mr. Frank was a pipefitter at Shell; thus sub-allegations 8, 9, and 10 are to be stricken from the Complaint.  The Court will not for purposes of the present Motion determine the ultimate admissibility of the affidavit, though certain of the legal conclusions therein are questionable.

h.     Draft Report

Eighth, Shell argues Exhibit 25, "December 1978, Draft Report: Human and Animal Toxicology of Benzene," should be stricken because it "is not identified, referenced, or cited anywhere in the Complaint."  Plaintiff does not address Exhibit 25 in its Response.  The Court also is unable to locate a reference or citation to this document in the Complaint.  While this document has no place as an attachment to the Complaint, the Court declines to strike it from the litigation entirely as it may be admissible later in the litigation.

i.     Unattributed Quotations

Ninth, Shell argues that paragraphs 31 and 32 of the Complaint should be stricken because they are merely unattributed quotations from Exhibit 2, a 1948 article from the American Petroleum Institute Toxicological Review, without explanation as to their application to the claims in the litigation.  In response, Plaintiff argues these allegations and exhibit are relevant because Shell was a member of the American Petroleum Institute and would have received this report, supporting her claims that Shell knew about the causal relationship between benzene and cancer-related illness.

It is concerning that Plaintiff fails to attribute the allegations in paragraphs 31 and 32 to

33

the article in Exhibit 2, especially since much of the language is directly quoted.  Aside from

this, the Court finds paragraphs 31 and 32 should be stricken because they fail to indicate how

they are related to the present matter.  Accordingly, the Court strikes paragraphs 31 and 32, but

does not make any ruling at this time as to the admissibility of the actual article to which these

paragraphs should have been attributed.

## IV.     TRAVELER'S MOTION TO APPLY THE COURT'S RULING

Travelers filed a Motion to Apply the Court's Ruling on the Motion to Dismiss Pursuant

to Rule 12(b)(6) and Motion to Strike Pursuant to Rule 12(f) filed by Shell to Travelers (R. Doc.

22).  Travelers notes it was sued by Plaintiff pursuant to the Louisiana Direct Action Statute as

the alleged liability insurer of Shell and Shell's alleged executive officers.  According to

Travelers, because there are no independent claims against it and its liability is solely derivative

of the liability of Shell, it is entitled to the same relief afforded to Shell.

Plaintiff filed a Response in opposition, incorporating many of its arguments raised in the

other motions addressed in this Order & Reasons and arguing she has independent claims against

Travelers "based on executive officer liability and the Louisiana Direct Action Statute, in

addition to any liability the [sic] would fact [sic] under their insurance policies for intentional

torts by the Executive Officers."  (R. Doc. 25).  She further argues, "[a]s the insurer of the

executive officers, even if the court finds that Shell was protected by the Louisiana Worker's

Compensation Laws, this would not relieve Traveler's [sic] from liability for the act of Shell's

executive officer from the time period of 1972 to 1976."  *Id.*

Plaintiff has filed claims against Travelers under Louisiana's direct action statute,

alleging Travelers provided insurance coverage to Shell and Shell's executive officers from 1972

to 1978.  *See* (R. Doc. 1).  "When an insurance company issues a policy of insurance to an employer covering claims for injuries to employees that may arise within the scope of the employer's business...during the period such insurance is in effect, claims for injuries occurring during such period by such employees against the employer or the insurance company shall be exclusively under the workers' compensation act."  La. Rev. Stat. 23:1166.  Thus, the claims against and liabilities of an employer for injuries to its employees are coextensive with that of its liability insurer.  *See Kelley v. M & M Dodge, Inc.*, 370 So. 2d 1267, 1269-70 (La. App. 1979); *accord Carlisle v. State Dep't of Transp. Dev.*, 400 So. 2d 284 (La. App. 3 Cir. 1981); *Dauzat v. State Farm Ins. Co.*, 473 So. 2d 920, 922 (La. App. 3 Cir. 1985).  Accordingly, it follows that the Court's rulings herein regarding Shell and Shell's executive officers are applicable to Travelers as these parties' liability insurer[4] to the extent these rulings pertain to the time period Travelers provided them with insurance coverage.

## V.    CONCLUSION

For the foregoing reasons, Shell's Motion to Dismiss is GRANTED IN PART and DENIED IN PART; Shell's Motion to Strike is GRANTED IN PART and DENIED IN PART; and Travelers' Motion is GRANTED, as specified by the Court.

New Orleans, Louisiana this 28th day of October, 2011.

---

[4]Although Plaintiff does not allege the type of insurance coverage provided by Travelers, if Travelers was Shell's workers' compensation insurer the result would be the same.  *See Gaylord Container/Temple Inland Corp. v. Dunaway*, 2009-2058, pp. 4-5 (La. App. 1 Cir. 5/7/10); 38 So. 3d 1083, 1086 ("The liability of a workers' compensation insurer is coextensive with that of the insured employer under the provision of the workers' compensation law requiring every workers' compensation policy to cover the entire liability of the employer.").

UNITED STATES DISTRICT JUDGE